*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0309p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

STEVE ELLIOT; GLENDA ELLIOT; HUNTER ELLIOT; NATHAN ELLIOT; and MEGAN ELLIOT,

*Plaintiffs-Appellees,*

No. 06-2006

*v.*

JOSHUA LATOR and SCOTT TAYLOR,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-74817—Gerald E. Rosen, District Judge.

Submitted: June 7, 2007

Decided and Filed: August 10, 2007

Before: MARTIN and SUTTON, Circuit Judges; GRAHAM, District Judge.[*]

---

**COUNSEL**

**ON BRIEF:** James T. Farrell, Ann M. Sherman, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Christopher J. Trainor, TRAINOR & ASSOCIATES, White Lake, Michigan, for Appellees.

---

**OPINION**

---

BOYCE F. MARTIN, JR., Circuit Judge. This case poses a curious procedural and jurisdictional question: In a civil rights action in which defendants are denied qualified immunity by the district court, do we have jurisdiction to hear an interlocutory appeal of this denial under the exception carved out in *Mitchell v. Forsyth*, 472 U.S. 511 (1985), if the defendants have not accompanied their assertion of qualified immunity with a motion to dismiss or for summary judgment? We hold that failure to file such a motion runs contrary to the key purpose of qualified immunity, as articulated in *Mitchell* and earlier in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), namely, that the doctrine exists to provide officials with immunity from suit and not simply

---

[*]The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

immunity from liability.  Neither *Mitchell* nor *Harlow* support interlocutory appellate jurisdiction given the procedural history of the instant case.  Quite to the contrary, both counsel against it.

I

Shortly after midnight on Sunday, February 21, 2004 in the town of Harrison, Michigan, Andrew Anderson (who is not a party to this case) placed a 911 call to report that he had been robbed at gunpoint.  Defendant state troopers Joshua Lator and Scott Taylor were dispatched to investigate.  Anderson told the troopers that the robbery stemmed from a financial dispute over an engine repair job that he had promised but never delivered.  Based on this interview, the troopers were led to suspect two likely perpetrators: William ("Billy") Fox and Ronald ("Ronnie") McClure.  The troopers then contacted the Clare County Sheriff's Department as well as the Bay Area Narcotics Enforcement Team (BAYANET), a multi-jurisdictional drug task force.  From these sources they identified several locations where Fox or McClure might be found.  Lator also received a phone call from Detective Craig Wilson of BAYANET, who allegedly told him that Ronnie McClure "frequented" a residence at 655 North First Street in Harrison.  According to Lator, Wilson told him that he believed McClure and his family had lived at this residence at some point in the past and that "he had had multiple prior contacts with both Fox and McClure and that [655 North First Street] would be a possible residence where . . . McClure would have either been hiding or possibly hid the weapon."  Lator Dep. at 63.  When Wilson was deposed, however, he conceded that his information about McClure was neither firsthand nor did he know whether it was recent or more than a year old.  As it turns out, 655 North First Street was the residence of Plaintiffs Steve and Glenda Elliot and their three children.

Lator subsequently prepared an affidavit in support of a search warrant for 655 North First Street.  He set forth the following facts as establishing probable cause to search:

> Your Affiant, Trooper Joshua Lator, is a Trooper with the Michigan State Police based at the Mt. Pleasant Post for the last 5 ½ years.

> Your Affiant is part of an ongoing investigation in the armed robbery of Andrew Charles Anderson by William Raymond Fox and Ronald William McClure II on or about 02/21/04 at approximately 2200 hours in the City of Harrison, Clare County, Michigan.

> As a result of the information gained through this investigation Felony Warrants have been issued for both William Raymond Fox and Ronald William McClure II for Armed Robbery.

> Anderson stated to your Affiant that McClure had an on going dispute with him over the purchase of an engine. Anderson stated McClure approached him in the home of Joshua Kerns, 445 N. Fourth St., City of Harrison, Clare County, State of Michigan and demanded that he "make the deal right".  Anderson reported that McClure told him he knew he had $600.00 in cash.  Anderson stated that Fox then entered the room revealing a black hand gun tucked in his waistband. Anderson stated that Fox said "Don't make me rob you." Anderson stated he was in fear for his life and felt he was being robbed at gun point. Anderson stated he gave McClure five (5) twenty dollar bills from his pocket.

> Through the course of this investigation your Affiant has learned that Ronald McClure II sometimes stays at 655 N. First St., City of Harrison, Clare County, State of Michigan.

Joint App'x at 184-85.  Lator identified the places to be searched as "the residence, vehicles and outbuildings located at 655 N. First St."  *Id*. at 184.  He identified the person and property to be seized as: (1) "Ronald William McClure," (2) "[a]ny vehicles located on the premises," (3) "[a]ny and all currency," (4) "firearms and weapons of any kind," and (5) "[p]roofs of residency and/or articles of domain and control, such as but not limited to utility bills, correspondence, rent receipts, keys to premises."  *Id*.  Magistrate Rick Labota signed the search warrant.  Troopers Lator and Taylor executed the search of plaintiffs' home around noon on Sunday, February 22, despite the fact that by this time both Fox and McClure had been taken into custody, a fact of which the troopers were fully aware because Lator had actually interviewed McClure while in custody before executing the warrant.

The search of plaintiffs' residence does not appear to have been a resounding success.  To the contrary, plaintiffs allege that Lator and Taylor and other officers (1) failed to wait between knocking at and breaking down the door; (2) entered the home with weapons drawn and yelled for Steve and Glenda Elliot and their three young children to get down on the floor; (3) handcuffed Steve Elliot; (4) stepped on the hand of Glenda Elliot; (5) destroyed plaintiffs' furnishings and threw their beds around; and (6) held the family at gunpoint, and kept Mr. Elliot handcuffed, throughout the entire 45-minute search of the home.  The search of plaintiffs' home revealed two registered firearms, neither of which was connected in any way to the prior night's robbery.  No evidence of criminal conduct was discovered, and accordingly, no charges were filed against any Elliot family member in connection with the incident.

II

The Elliots filed a complaint in federal court on December 9, 2004, alleging that Troopers Lator and Taylor violated their federal constitutional rights, as well as their rights under state law.  Specific allegations included assault and battery, false arrest, false imprisonment, excessive force, and improper entry into a private residence without a valid search warrant.  On February 9, 2005, defendants filed an answer in which they asserted several affirmative defenses, including qualified immunity as a general defense to all of the Elliots' claims.  After the close of discovery, on December 13, 2005, the Elliots moved for summary judgment against defendants.  On May 30, 2006, defendants responded to the Elliots' summary judgment motion.  This came over four months after the deadline for such response had passed, but the district court entertained it nevertheless.  The troopers argued primarily that even if the search warrant they executed was ultimately found to be invalid, they should nevertheless be protected by the good-faith exception articulated in *United States v. Leon*, 468 U.S. 897 (1984).  The troopers did not, however, file a cross-motion for summary judgment on grounds of qualified immunity (or any other grounds, for that matter).  They simply made passing reference to qualified immunity in their response to the Elliots' motion for summary judgment, without any elaboration of the qualified immunity doctrine itself or how it is often viewed as coextensive with the *Leon* good-faith exception.  For example, the final paragraph of defendants' response states:

> [D]efendants request that the court find that the supporting affidavit gave the magistrate a substantial basis for concluding that a search would uncover evidence of wrongdoing at 655 North First Street, but even if the search warrant was issued without the requisite showing of probable cause, . . . , given the totality of the circumstances, Trooper Lator reasonably believed he had probable cause.  Thus, the *Leon* good faith exception applies.  Thus, plaintiffs' motion for summary judgment should be denied, and defendants should be accorded qualified immunity.

Joint App'x at 149.

On June 1, 2006, the district court held a hearing on the Elliots' motion for summary judgment. The court granted the motion as to "at least one" federal constitutional claim, finding:

> (i) that the search warrant pursuant to which the Defendant state troopers searched Plaintiffs' residence was not supported by a proper showing of probable cause to believe that contraband or evidence of a crime would be found at this location; and (ii) that the Defendant troopers could not rely upon a magistrate's issuance of this search warrant as a ground for qualified immunity, where the application in support of the warrant was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable."

*Elliot v. Lator*, 2006 WL 1806475, at *1 (E.D. Mich. June 28, 2006) (quoting *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986)). The court then requested that the parties file supplemental briefs addressing the Elliots' remaining federal claims, as well as their state-law claims.

In an opinion and order dated June 28, 2006, the district court made several rulings. *First*, the court reiterated its position that the Elliots were entitled to summary judgment on their central Fourth Amendment claim—"unreasonable seizure"—because the warrant to search their home was not supported by probable cause and because the troopers' actions in obtaining the warrant were not shielded by qualified immunity. *Second*, the court addressed an ancillary Fourth Amendment claim, namely, that the troopers used excessive force on members of the Elliot family during their search of 655 North First Street. The court found the two claims to be interrelated, reasoning as follows:

> [U]nder the facts of this case, Plaintiffs' claims of unlawful seizure and excessive force are largely duplicative, since the force used against Plaintiffs was applied principally, if not exclusively, in aid of their detention during the course of the search. Not surprisingly, then, having already determined as a matter of law that the detention of Plaintiffs was unreasonable, the Court further concludes that the force employed to effect this detention also was unreasonable. . . .
>
> Because the suspected armed robber was already in custody, the Defendant troopers and the other members of the raid team had no reason to believe that anyone on the premises posed a particular threat to the safety of the officers or others. Indeed, there was no ground for suspicion that anyone within Plaintiffs' home had any involvement in the armed robbery that triggered the search; rather, this search was predicated only on the assertion that the suspect "sometimes stay[ed]" at Plaintiffs' home, so that there was some purported reason to suspect that the suspect might have stored some of the evidence of his crime at this residence. In addition, the Court already has noted the absence of any evidence that any Plaintiff behaved in a way that would have triggered any concerns for the safety of the officers or others on the premises.
>
> Under these circumstances, the case law indicates that handcuffs and drawn weapons would be excessive.

*Id*. at *11-12. Despite the district court's strong language, however, it declined to grant summary judgment to the Elliots on the excessive force claim. The court noted:

> Defendants have identified two potential obstacles to an award of summary judgment to Plaintiffs on their claim of excessive force. First, the pertinent record is not free from dispute. As one example, Plaintiff Steve Elliot testified that he was handcuffed for nearly the entire duration of the search, but Defendants have cited the testimony of a state trooper that Mr. Elliot was handcuffed for only a brief period of perhaps

two or three minutes.  Next, and as noted earlier, the record is not entirely clear as to the force employed by the two named Defendant troopers, as opposed to other members of the raid team.  Accordingly, only certain aspects of Plaintiffs' excessive force claim are capable of resolution as a matter of law under the present record; the precise extent of Defendants' liability must await determination in a future proceeding.

*Id*. at *12.  Thus, on the two constitutional claims, the district court granted the Elliots' motion for summary judgment only as to one of them.  The district court ruled that future proceedings were required to determine "certain narrow issues of liability" (as to the excessive force claim) and damages (as to the unreasonable seizure and excessive force claims).  *Id*. at *2.  *Finally*, the district court treated the Elliots' state-law claims as effectively waived, because they "were addressed in only a perfunctory fashion in Plaintiffs' initial summary judgment motion, and are barely mentioned in their supplemental brief."  *Id*. at n.4.

On appeal, defendants ask us to review a narrow question: "Did the District Court err in ruling that no reasonable officer under [the instant] circumstances would have believed that probable cause supported the issuance of the warrant?"  State's Br. at 2.

III

At first blush, this seems like a straightforward collateral appeal of a denial of qualified immunity, over which we would have jurisdiction pursuant to the collateral order doctrine.  *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (holding that a district court's denial of qualified immunity, "to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment").  Defendants attempt to nudge us in this direction by stating, in the jurisdictional statement of their brief, that they "filed a Motion for Summary Judgment based upon qualified immunity," and that they "timely filed this interlocutory appeal of the District Court's June 28, 2006 denial of their Motion for Summary Judgment as to qualified immunity."  State's Br. at 1.  Yet this is a complete misrepresentation of the *actual* procedural history of this case, for in actuality defendants have filed no such motion for summary judgment.  Rather, as recounted above, they simply filed an extremely belated *response*—not a motion—to the *plaintiffs'* motion for summary judgment.  And in that response defendants stated, almost in passing, that they should be "accorded" qualified immunity.  Joint App'x at 149.  We have no idea why they did not file a motion for summary judgment on their own behalf (after all, in most § 1983 cases that appears to be the first thing any municipal defendant will do, regardless of the chance of success), but the fact remains that they did not.  And for them to suggest otherwise in their papers before this court is dangerously misleading.

To be sure, defendants have asserted a *claim* of qualified immunity.  They did so both in their response to the Elliots' initial complaint and in their response to the Elliots' motion for summary judgment.  And to be sure, the district court treated defendants' qualified immunity claim seriously, despite ultimately rejecting it.  The question is whether this mere assertion of a claim of qualified immunity, *without being raised by defendants in a motion for summary judgment or a motion to dismiss*, is enough to support appellate jurisdiction when that claim is denied by the district court.  Put another way, is the district court's ruling in this case an "appealable interlocutory decision" under *Mitchell*?  We think it is not.

*Mitchell* was a case in which, after extensive discovery, the parties filed cross-motions for summary judgment.  The plaintiff's motion was granted by the district court and the defendant's motion was rejected.  The district court thus scheduled further proceedings only on the issue of damages.  472 U.S. at 517.  The defendant sought immediate appeal of this denial of his motion for summary judgment (i.e., this denial of qualified immunity), and the question before the Supreme

Court was whether such immediate appeal of the qualified immunity issue was proper under 28 U.S.C. § 1291, the statute which confers on appellate courts jurisdiction over "appeals from all final decisions of the district courts of the United States." The Court answered in the affirmative, noting that district court denials of qualified immunity fall within "that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.* at 524-25 (quoting *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546 (1949)).

In reaching this conclusion, the Court focused on those factors which animate the qualified immunity doctrine in the first place, namely, "the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Id.* at 526 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982)). And the Court further explained that the qualified immunity doctrine was constructed not simply to shield deserving officials from trial, but also from pre-trial matters, such as discovery. *Id.* ("[E]ven such pretrial matters as discovery are to be avoided if possible, as '[i]nquiries of this kind can be peculiarly disruptive of effective government.'" (quoting *Harlow*, 457 U.S. at 816)). This is why, in federal civil rights actions, qualified immunity is frequently the lynchpin of a defendant's motion to dismiss on the pleadings or for summary judgment. As the Court famously summed up, qualified immunity "is an *immunity from suit* rather than a mere defense to liability." *Id.* (emphasis in original); *see also id.* at 527 ("[T]he [district] court's denial of summary judgment finally and conclusively determines the defendant's claim of right not to *stand trial* on the plaintiff's allegations." (emphasis in original)).

The primary procedural distinction between this case and *Mitchell* is that there the defendant had filed a motion for summary judgment on grounds of qualified immunity, whereas here the troopers failed to file any such motion, only raising the qualified immunity claim as part of their response to the Elliots' motion for summary judgment. Is this a distinction that makes a difference? We think it is.

On the one hand, we must be wary of elevating form over substance. For example, one might read the Court's language in *Mitchell* to suggest that it was not the denial of the defendant's *motion* for summary judgment, but rather the denial of the *claim* of qualified immunity, that allowed for the interlocutory appeal. 472 U.S. at 530 ("[W]e hold that a district court's denial of a *claim* of qualified immunity, to the extent that it turns on an issue of law, is an appealable "final decision" within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." (emphasis added)). On the other hand, subsequent cases construing *Mitchell* all seem to contemplate that defendants are appealing from the district court's denial of a *motion* for summary judgment or a *motion* to dismiss. *See, e.g, Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) ("*Mitchell* . . . unmistakably envisioned immediate appeal of the denial of a defendant's motion for dismissal or summary judgment on the ground of qualified immunity." (internal quotation marks and brackets omitted)); *Johnson v. Jones*, 515 U.S. 304, 311 (1995) ("[I]n *Mitchell* [], this Court held that a district court's order denying a defendant's motion for summary judgment was an immediately appealable "collateral order" ( i.e., a "final decision") under *Cohen* . . . ."); *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("The principles of qualified immunity that we reaffirm today require that Anderson be permitted to argue [as he did before the district court] that he is entitled to summary judgment . . . ."); *Kennedy v. City of Cleveland*, 797 F.2d 297, 299 (6th Cir. 1986) (noting that *Mitchell* "contemplates two stages at which the doctrine of immunity may be interposed in advance of trial to avoid two distinct burdens of litigation," and thus qualified immunity may be raised both in a motion to dismiss or in a motion for summary judgment).

More importantly, this is clearly a scenario in which form *has* substance, especially in light of what the Court has said about the rationale for the qualified immunity doctrine. Imagine, for

example, that we were to exercise our jurisdiction to hear the troopers' interlocutory appeal in this case. Imagine further that we were to reverse the decision of the district court and find the troopers entitled to qualified immunity on the Elliots' unreasonable seizure claim, just as the troopers had argued in their response to the Elliots' motion for summary judgment. This would be the equivalent of our finding the troopers' affirmative defense of qualified immunity to be meritorious, and it would force the district court on remand to deny the Elliots' motion for summary judgment. However, as a response to a plaintiff's motion for summary judgment, a meritorious affirmative defense simply puts the case back into the realm of the jury, because it indicates that there exist facts which, when viewed in light most favorable to the defendant (the non-moving party), could permit the defendant to prevail at trial. Thus, without a motion or cross-motion for summary judgment from the troopers (i.e., the *defendants*), our ruling in their favor would most likely result in the case being sent back for a full-blown trial. Ironically, this would subject the troopers to additional trial proceedings, which is the exact opposite of what officers hope to achieve by raising the qualified immunity issue on interlocutory appeal.

In other words, if we were to exercise jurisdiction and affirm the district court on the qualified immunity issue, the district court's grant of summary judgment in favor of the Elliots would stand, leaving only a damages proceeding to be conducted. But if we were to exercise jurisdiction and *reverse* the district court, this would have the perverse result not of *shielding* the public officials from trial, but of likely subjecting them—at least in the short run—to *more* trial than they currently face. The troopers' "risks of trial," *Harlow*, 457 U.S. at 816, as well as the costs attendant to these risks, would be increased, not decreased. This is completely at odds with the underlying purpose of qualified immunity, which is to protect officials not simply from liability, but from suit itself, that is, from unnecessary litigation proceedings.

This is not to say that if we decline jurisdiction the troopers might not, in the long run, face similar prospects of trial. After all, if we decline jurisdiction the district court will conduct a damages proceeding on the unreasonable seizure issue, at which point the troopers can still appeal both liability and damages—this time as a *direct*, not interlocutory, appeal. If we *then* were to reverse as to liability (for example, because the question turned on a material issue of disputed fact), then summary judgment in favor of the Elliots would be denied and the issue would go to trial. Thus we do not decline jurisdiction in this case because we think it will guarantee defendants the absolute lowest quantum of trial proceedings. Rather, we decline jurisdiction because without having filed a motion for summary judgment, defendants have shown no particular inclination *not* to go to trial. As such, they should not necessarily benefit from rules designed to further this aim. Indeed, while we do not pass judgment on the merits of defendants' qualified immunity claim, we point out only this: the more likely it is to succeed, the more inexplicable is defendants' failure to file a motion for summary judgment. If a defendant is genuinely interested in cutting off future trial proceedings, the logical (and proper) vehicle for this is a well-briefed motion to dismiss or for summary judgment, not an end-run interlocutory appeal.

The existence of the Elliots' additional Fourth Amendment claim for excessive force reinforces this analysis. Unlike the unreasonable seizure claim, the district court denied summary judgment in favor of the Elliots with respect to this excessive force claim. *Elliot*, 2006 WL 1806475, at *11-12. Still, defendants appear not to have challenged this claim, either in their response to the Elliots' motion for summary judgment or in the instant appeal. Perhaps they believe that if they are accorded qualified immunity with respect to the unreasonable seizure claim, then it should follow that they be immune from the excessive force claim as well. Not so. The two claims are related, to be sure, but they are not inseparable, nor does the outcome of one dictate the outcome of the other. For example, even if the troopers had a squeaky clean warrant to search the Elliots' home (or even if, under the circumstances, they were entitled to reasonably rely on a not-so-squeaky-clean warrant), they still could have violated the Elliots' constitutional rights during the *execution* of the search warrant. The mere facial validity of the warrant, or indeed the officers'

reasonable reliance on it, would not shield them from liability for all actions taken pursuant to that warrant. The district court recognized this distinction as well, noting as follows:

> It would have been possible, in the Court's view, for Defendants to limit their liability by conducting themselves differently upon entering Plaintiffs' home — Defendants could have elected, for example, to forgo any forcible detention of Plaintiffs while executing the search warrant. This was the matter that the Court invited the parties to discuss in their supplemental briefs, but that Plaintiffs (and Defendants) largely failed to address — namely, whether Plaintiffs were entitled to summary judgment in their favor as to any ***additional*** constitutional or state-law violations allegedly committed by Defendants upon entering Plaintiffs' home, beyond the Fourth Amendment violation committed by entering the home pursuant to a warrant issued without probable cause.

*Elliot*, 2006 WL 1806475, at \*11 n.20 (emphasis in original).

In light of their utter failure to raise appropriate defenses or motions to dismiss as to the excessive force claim, the troopers undoubtedly will be going to trial on certain aspects of it. Thus, even if we were to exercise jurisdiction as to the qualified immunity denial on the unreasonable seizure claim, and even if we were to reverse the decision of the district court and grant qualified immunity to the troopers, and even if upon remand the troopers could somehow parlay our ruling into a motion for summary judgment on the unreasonable seizure claim, they *still* would not be spared trial on the excessive force claims.

IV

The Supreme Court has seen fit to allow interlocutory appeals from the *Mitchell*-like scenario in which a civil rights defendant is denied a motion to dismiss or for summary judgment. But the Court has also counseled against overuse of the doctrine:

> Given [28 U.S.C. § 1291], interlocutory appeals—appeals before the end of district court proceedings—are the exception, not the rule. The statute recognizes that rules that permit too many interlocutory appeals can cause harm. An interlocutory appeal can make it more difficult for trial judges to do their basic job—supervising trial proceedings. It can threaten those proceedings with delay, adding costs and diminishing coherence. It also risks additional, and unnecessary, appellate court work either when it presents appellate courts with less developed records or when it brings them appeals that, had the trial simply proceeded, would have turned out to be unnecessary.

*Johnson*, 515 U.S. at 309. Because interlocutory appeals are "the exception, not the rule," the most prudent thing for us to do in this case is to let the lower court proceedings play out until conclusively resolved, at which point Troopers Lator and Taylor may bring an appeal from this final judgment if they so desire. Unlike *Mitchell*, and unlike *Cohen*, this case presents a multitude of reasons for deferring our appellate consideration "until the whole case is adjudicated." *Cohen*, 337 U.S. at 546.

Accordingly, we decline to exercise jurisdiction over defendants' interlocutory appeal, and thus **DISMISS** and **REMAND** to the district court for completion of its proceedings.