RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0184p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

JAMES WILLIAMS; MARCIONA MITCHELL,

                              *Plaintiffs-Appellees*,

        *v.*

BRIAN MAURER; RUSSELL CHARLES GARTHA; TYLER
FEGREUS; ERIC JACHYM; COLE ARMIL; TREVOR
ELLIOT; PATRICK MCCORMICK,

                              *Defendants-Appellants*.

┐
│
│
│
│
├  No. 20-1996
│
│
│
│
┘

─────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:19-cv-10850—Judith E. Levy, District Judge.

Decided and Filed:  August 17, 2021

Before:  BOGGS, CLAY, and WHITE, Circuit Judges.

─────────────

**COUNSEL**

**ON BRIEF:**  Kali M. L. Henderson, T. Joseph Seward, SEWARD HENDERSON PLLC, Royal
Oak, Michigan, for Appellants.  Matthew S. Kolodziejski, LAW OFFICE OF MATTHEW S.
KOLODZIEJSKI, PLLC, Troy, Michigan, for Appellees.

─────────────

**OPINION**

─────────────

CLAY, Circuit Judge.  At about 5 o'clock in the morning on December 28, 2018,
Defendants Brian Maurer, Russell Gartha, Eric Jachym, Tyler Fegreus, Patrick McCormick, Cole
Armil, and Trevor Elliot, all officers employed by the Southfield Police Department, entered the
home of Plaintiff Marciona Mitchell and her guest, Plaintiff James Williams, without a warrant

and proceeded to arrest Williams.  In this 42 U.S.C. § 1983 action, Defendants bring an interlocutory appeal of the district court's grant of Plaintiffs' motion for partial summary judgment on Williams' claim for false arrest, and denial of their motion for partial summary judgment on Plaintiffs' claim for unlawful entry and Mitchell's claim for excessive force.  For the reasons set forth below, we **DISMISS IN PART** Defendants' appeal for lack of jurisdiction and **AFFIRM IN PART** the district court's decision.

## BACKGROUND

### Factual Background

In March 2013, Plaintiff Marciona Mitchell moved into an upstairs apartment in 21700 Colony Park Circle, Southfield, Michigan.  A few years later, along with her young son, Mitchell moved downstairs into Apartment 103.  Plaintiff James Williams was Mitchell's friend since childhood when they were in school together, and, at the time of the events at issue in this case, Mitchell and Williams were in a romantic relationship and Williams was spending approximately four to five nights a week in Mitchell's apartment.

At 4:36 a.m. on December 28, 2018, an anonymous person called 911 and was connected to the Southfield Police Department.  (R. 23-2 at 0:00–0:10.)  The anonymous caller reported that "someone had just busted into [her] neighbors." (*Id.* at 0:12–0:16.)  She further reported that she "heard him down there screaming" and that she "heard some . . . glass breaking." (*Id.* at 1:00–1:10.) She also stated that, although she did not know who they were, the screaming was between a man and woman, and that she "heard him break the glass." (*Id.* at 1:17–1:23.)  The caller provided 21700 Colony Park in Southfield as the address of the disturbance but declined to provide her apartment number or her name because she did not "want to get involved." (*Id.* at 0:40–0:42, 1:42–1:47.) She did, however, inform the 911 operator that the neighbor's apartment number was "uh . . . uh . . . 1, 0, 3." (*Id.* at 0:50–0:57.)

While the anonymous caller was talking to the 911 operator, police dispatch sent officers to the scene.  The above information about the alleged disturbance was then relayed to the responding officers.  At 4:40 a.m., dispatch further told the responding officers that the

"anonymous caller believes that the door to that apartment was kicked in before the screaming started." (*Id.* at 4:20–4:30.)

Defendants Fegreus, McCormick, Elliot, and Armil arrived at the apartment building at about 4:42 a.m.  When they entered the building, they heard screaming.  But the officers could not identify where the screaming was coming from.  On the audio recording from Fegreus' body microphone, he can be heard saying, "we don't think it's coming from 103.  We walked in, we heard yelling . . . .  They're gonna check up there.  [Elliot] thought he heard it upstairs.  I don't know where it's from." (R. 22-3 at 3:52–4:06.)  The officers also noted that there was "no sign of forced entry to the front door" of Apartment 103.  (R. 23-5 at PageID# 598.)

Three minutes after arriving on the scene, at about 4:45 a.m., Fegreus and McCormick knocked on the door to Apartment 103.  Over the next 30 seconds, they knocked intermittently on the door.  While Fegreus and McCormick stood at the door to Apartment 103, Armil and Elliot went to look for the broken glass that the anonymous caller had mentioned.  Outside of Apartment 103, they discovered broken glass from a window.  However, the window was double paned and only the outer pane was broken.  Thus, Armil was "able to determine that [the window] was not a point of entry for an intruder." (R. 23-6 at PageID# 611.)  Armil and Elliot also did not see anything suspicious through the window.

Meanwhile, about a minute after first knocking on the door to Apartment 103, at about 4:46 a.m., Fegreus called dispatch to confirm the apartment number because, as he reported to dispatch, "it's locked, and there's no answer and it's all quiet." (R. 22-3 at 6:08–6:41; R. 23-2 at 5:35–5:57.)  Armil and Elliot then returned, and Armil told Fegreus and McCormick about the broken glass.

At that point, at around 4:47 a.m., Fegreus announced for the first time, "Southfield Police, open the door." (R. 22-3 at 7:31–7:33.)  Defendants then began talking amongst themselves.  After briefly discussing the broken glass, Defendants discussed whether they should "boot the door." (*Id.* at 7:59–8:00.)  At about 4:48 a.m., the discussion about booting the door was interrupted by a call from the dispatch officer letting Defendants know that she had called

the anonymous caller back and that the caller now said that she "can't be positive what apartment it was coming from." (*Id.* at 8:13–8:17; R. 23-2 at 6:25–6:40.)

In the minute that Defendants had been conversing and talking to dispatch, there was no knocking on the door. But after talking to dispatch, one of the officers suggested that they "keep knocking on the door. They're gonna answer eventually." (R. 22-3 at 8:36–8:38.) Around this time, Defendants Maurer, Gartha, and Jachym joined Fegreus, McCormick, Armil, and Elliot at the door to Apartment 103. For about the next two minutes, Defendants intermittently shouted and knocked loudly on the door.

At approximately 4:51 a.m., after Fegreus and McCormick had been standing at the door to Apartment 103 for about eight minutes without hearing any signs of a disturbance, and close to four minutes after Fegreus first announced the police presence, Mitchell partially opened the door. Mitchell says that she "cracked [the door] enough for them to see that everything was okay and intact, but not giving access to [her] apartment." (R. 22-12 at PageID# 514.) She also "put [her] knee to the door just for protection so that the door wouldn't be all the way opened." (*Id.*)

The audio recording from Fegreus' body microphone reveals the following exchange taking place between Fegreus and Mitchell:

Fegreus: Hi, how you doing?

Mitchell: I'm fine.

Fegreus: What happened to your window?

Mitchell: I don't fucking know. I just heard somebody throw something and run.

Fegreus: Okay, there's nobody screaming and yelling because we . . .

Mitchell: No.

Fegreus: Okay.

Mitchell: I'm okay.

Fegreus: Okay . . . . because we got that people were fighting and then there's a glass break.

Mitchell: Nobody's fighting.

Fegreus: What take you so long, what took you so long to answer the door? We've been knocking . . .

Mitchell: Because I'm asleep.

Fegreus: Alright, you got an ID with you.

Mitchell: I have an ID.

Fegreus: Okay.

(R. 22-3 at 11:19–11:45.)

At that point, even though none of the Defendants noticed any visible injuries on Mitchell or saw any signs of suspicious activity, Defendants began to push their way into the apartment. Mitchell can be heard protesting: "Excuse me, you don't have a . . . you don't have anything to . . ." (*Id.* at 11:46–11:48.)  While Fegreus responded, "relax, relax," another officer shouted, "we got exigent circumstances.  We're coming in." (*Id.* at 11:47–11:51.)  Mitchell protested, "no, no, no." (*Id.* at 11:48–11:51.)  But Defendants "pushed the door open, banged it against [Mitchell's] knee and came in" to the apartment.  (R. 22-2 at PageID# 512; R. 22-3 at 11:51–11:52.) Defendants' forceful opening of the door caused Mitchell's knee to start bleeding.

Mitchell continued to object to the warrantless entry.  She told Defendants, "You can't just bust into my door." (R. 22-3 at 11:53–11:55.)  One officer responded, "Yes, we can.  Yes, we can." (*Id.* at 11:55–11:56.)  While Mitchell continued "yelling" and "telling [Defendants that] they had no business being in [her] apartment," Williams walked out of Mitchell's bedroom. (R. 22-2 at PageID# 516.)

Armil testified that he saw Williams "standing still" in the hallway.  (R. 23-6 at PageID# 613.) Armil allegedly asked Williams to "to remove his left hand from behind his back" so that he could "confirm that [Williams] didn't have a weapon in his hand." (*Id.*)  According to Armil, Williams did not reply, was "irate and upset[,] and began to back into the bedroom." (*Id.*)  At this point, Armil believed that he had probable cause to arrest Williams for "[r]esisting" and "obstructing." (*Id.*)

Mitchell testified that she saw Defendants "charge[] towards [Williams], and "tackl[e] him."  (R. 22-2 at PageID# 516.)  Mitchell further alleged that Defendants then "slammed [Williams] down" so hard that Mitchell "thought they were going to kill him." (*Id.*)  On the audio recording, Defendants can be heard shouting, "Get on the ground"; "You're gonna get tased"; "Roll on your stomach"; and "Put your hands behind your back." (R. 22-3 at 12:09–

13:53.) Mitchell can be heard shouting "Are you going to kill us?"; "Oh my god, somebody help"; and "Oh my god, what are you all doing?" (*Id.* at 12:09–13:53.) Williams is recorded repeatedly shouting, "I'm not doing nothing"; "I'm putting my hands like this"; and "What are they doing to me?" (*Id.* at 12:09–13:53.) After being arrested, Williams refused to walk to the police car and had to be hand-carried to the vehicle by several officers. When Williams complained that he was being "treated like a fucking criminal," one Defendant responded, "well you are now." (*Id.* at 17:25–1730.) Williams was booked that night into the Southfield Jail and was charged with resisting arrest and obstruction of police. While Williams was being transported to jail, Armil conducted a search of the apartment. No evidence of an emergency or of illegal activity was found. The case against Williams was later dismissed. Defendants' forcible opening of the door to Apartment 103 has allegedly left a permanent scar on Mitchell's knee.

**Procedural Background**

On March 22, 2019, Mitchell and Williams filed a complaint under 42 U.S.C. § 1983 in the district court. Both Mitchell and Williams asserted claims for unlawful entry and excessive force, and Williams asserted claims for false arrest and malicious prosecution. On December 2, 2019, the parties cross-moved for partial summary judgment. Asserting the defense of qualified immunity, Defendants sought summary judgment on Plaintiffs' unlawful entry claim and Mitchell's excessive force claim. Mitchell moved for summary judgment on her unlawful entry claim against all Defendants and on her excessive force claim against Fegreus, McCormick, Armil, and Elliot. Williams moved for summary judgment against all Defendants on his unlawful entry claim, and moved for summary judgment against McCormick, Armil, and Elliot on his excessive force and false arrest claims. The parties subsequently stipulated to the dismissal of Williams' malicious prosecution claim against Jachym and Mitchell's excessive force claim against Maurer, Gartha, and Jachym.

On September 9, 2020, the district court granted summary judgment to Williams on his false arrest claim, granted summary judgment to Defendants on part of Williams' excessive force claim,[1] and denied the remainder of the partial motions for summary judgment. *See Williams v. Maurer*, No. 19-10850, 2020 WL 5412191, at *13 (E.D. Mich. Sept. 9, 2020). Defendants then timely appealed the district court's opinion and order.

## DISCUSSION

### I. Jurisdiction

"We first 'must determine that [we] have jurisdiction before proceeding to the merits' of [Defendants'] appeal." *Himmelreich v. Fed. Bureau of Prisons*, — F.4th —, 2021 WL 3088264, at *3 (6th Cir. July 22, 2021) (quoting *Lance v. Coffman*, 549 U.S. 437, 439 (2007)). Although the district court had jurisdiction under 28 U.S.C. § 1331, the parties dispute whether this Court has jurisdiction over the entirety of Defendants' appeal from the district court's nonfinal order.

Under 28 U.S.C. § 1291, this Court has jurisdiction to hear an appeal only from a "final decision[]" of the district court. Nonetheless, "[u]nder the collateral-order doctrine a limited set of district-court orders are reviewable 'though short of final judgment.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996)). The collateral order doctrine provides that "a decision of a district court is appealable if it falls within 'that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.'" *Mitchell v. Forsyth*, 472 U.S. 511, 524–25 (1985) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)). Thus, "[u]nder this doctrine, an order is immediately appealable if the order: (1) conclusively determined the disputed question; (2) resolved an important issue

---

[1]Although Defendants did not move for summary judgment on Williams' excessive force claim, the district court *sua sponte* granted summary judgment to Defendants on part of Williams' excessive force claim. This Court has explained "that the granting of summary judgment *sua sponte* is 'a practice we discourage.'" *Emps. Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 105 (6th Cir. 1995) (quoting *Beaty v. United States*, 937 F.2d 288 (6th Cir. 1991)). "Before a court can grant summary judgment 'on grounds not raised by a party,' the parties must be provided 'notice and a reasonable time to respond.'" *George v. Youngstown State Univ.*, 966 F.3d 446, 467 (6th Cir. 2020) (quoting Fed. R. Civ. P. 56(f)(2)). Because the proceedings below are not final, whether the district court erred in *sua sponte* granting summary judgment to Defendants on this claim is not presently an issue before us.

completely separate from the merits of the action; and (3) would be effectively unreviewable on appeal from a final judgment." *Crockett v. Cumberland Coll.*, 316 F.3d 571, 578 (6th Cir. 2003) (citations omitted). But "[t]he Supreme Court has 'repeatedly stressed that the "narrow" exception should stay that way and never be allowed to swallow the general rule, that a party is entitled to a single appeal, to be deferred until final judgment has been entered, in which claims of district court error at any stage of the litigation may be ventilated.'" *Himmelreich*, — F.4th —, 2021 WL 3088264, at \*3 (quoting *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994)).

It is well established that "[a] district-court decision denying a Government officer's claim of qualified immunity can fall within the narrow class of appealable orders despite 'the absence of a final judgment.'" *Iqbal*, 556 U.S. at 671–72 (quoting *Mitchell*, 472 U.S. at 530). "This is so because qualified immunity—which shields Government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights—is both a defense to liability and a limited entitlement not to stand trial or face the other burdens of litigation." *Id.* at 672 (internal quotations and citations omitted). In other words, a district "court's denial of summary judgment finally and conclusively determines the defendant's claim of right not to stand trial on the plaintiff's allegations," *Mitchell*, 472 U.S. at 527, and would, of course, "prove 'effectively unreviewable on appeal from a final judgment'" *after* trial, *Iqbal*, 556 U.S. at 672 (quoting *Mitchell*, 472 U.S. at 527–28). But not all such decisions are immediately appealable. "[A] claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated" only when "the appealable issue is a purely legal one: whether the facts alleged . . . support a claim of violation of clearly established law." *Mitchell*, 472 U.S. at 527–28 & n.9; *see also Iqbal*, 556 U.S. at 672; *Johnson v. Jones*, 515 U.S. 304, 313 (1995). Therefore, on Defendants' appeal of the district court's denial of their motion for summary judgment on Plaintiffs' claim for unlawful entry and Mitchell's claim for excessive force, it is undisputed that this Court has jurisdiction because Defendants "raise[d] the purely legal issue of whether [Plaintiffs'] facts show that [Defendants] violated clearly established law." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013).

However, Williams argues that this Court lacks jurisdiction to consider Defendants' appeal from the district court's resolution of his false arrest claim.  We agree.  As an initial matter, Defendants did not move for summary judgment on this claim; rather, the district court granted Plaintiffs' motion for summary judgment.  That is, unlike Defendants' appeal on the unlawful entry and excessive force claims, Defendants' appeal from the district court's resolution of Williams' false arrest claim is not an appeal from a denial of a government official's motion for summary judgment asserting the defense of qualified immunity—a situation where it is well established that a nonfinal order can often be appealed.  *See, e.g.*, *Iqbal*, 556 U.S. at 671–72.

Defendants nonetheless argue that we have jurisdiction over the district court's resolution of the false arrest claim under the qualified immunity exception to § 1291.  According to Defendants, they raised the defense of qualified immunity in their response to Plaintiffs' motion for summary judgment, and they should not be "punished" for failing to move for summary judgment on the false arrest claim because, after they decided that factual disputes would have precluded a grant of summary judgment, they complied with their ethical obligation to not file frivolous motions.  (Appellants Br. at 27.)

For three reasons, Defendants' argument fails.  First, a review of Defendants' response to Plaintiffs' motion for summary judgment shows that they did not assert the defense of qualified immunity in their response to this claim.[2]  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019) (explaining that a litigant forfeits the right to raise qualified immunity on appeal when they fail to raise it before the district court).  Second, even if they had done so, the "mere assertion of a claim of qualified immunity, *without being raised by defendants in a motion for summary judgment or a motion to dismiss*, is" not "enough to support appellate jurisdiction."

---

[2]For example, the "question presented" in Defendants' response to Plaintiffs' motion for summary judgment on this claim was:  "Whether the Plaintiff Williams is entitled to summary judgment on his false arrest claim where he ignored Defendants['] testimony that creates a clear question of fact that would permit a reasonable juror to find he was lawfully seized and arrested?"  (R. 28 at PageID# 881.)  In the introduction section, while Defendants asserted that "[t]heir conduct did not violate any clearly established rights of either Plaintiff, and they are entitled to qualified immunity on Plaintiffs' Illegal Entry Claim and Plaintiff Mitchell's Excessive Force Claim," as to the false arrest claim, Defendants asserted:  "Defendants' complete testimony demonstrates why their force against, and arrest of Plaintiff Williams was reasonable and legal."  (*Id.* at 888.)  Nowhere in the section titled "Illegal Seizure and Arrest" are the phrases "qualified immunity" or "clearly established" mentioned—rather, Defendants only argued that they had probable cause to arrest Williams.  (*Id.* at 907–909.)

*Elliot v. Lator*, 497 F.3d 644, 649 (6th Cir. 2007). This is so because the consequence of the district court's grant of summary judgment to Williams on his false arrest claim is that the claim is no longer being litigated. Although there is not yet a final judgment, the continuing proceedings below will not force Defendants to face any "burdens of litigation" from this claim, and they will also not have "to stand trial" on the claim. *Iqbal*, 556 U.S. at 672 (quoting *Mitchell*, 472 U.S. at 526). "But if we were to exercise jurisdiction and reverse the district court," because Defendants did not move for summary judgment, the claim would be put "back into the realm of the jury," which "would have the perverse result not of shielding the public officials from trial, but of likely subjecting them—at least in the short run—to more trial than they currently face."[3] *Elliot*, 497 F.3d at 651 (emphasis omitted). Finally, it is not a punishment to comply with "the general rule, that a party is entitled to a single appeal, to be deferred until final judgment has been entered, in which claims of district court error at any stage of the litigation may be ventilated." *Himmelreich*, — F.4th —, 2021 WL 3088264, at *3 (quoting *Digital Equip. Corp*, 511 U.S. at 868); *see also* 28 U.S.C. § 1291. Thus, under § 1291, this Court lacks jurisdiction to consider the false arrest claim.

Defendants alternatively argue that under the doctrine of pendent appellate jurisdiction this Court should exercise jurisdiction to consider the false arrest claim. "Under the doctrine of pendent appellate jurisdiction, . . . a court of appeals may, in its discretion, 'exercise jurisdiction over issues that are not independently appealable when those issues are "inextricably intertwined" with matters over which the appellate court properly and independently has jurisdiction.'" *Farm Lab. Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 549 (6th Cir. 2002) (quoting *Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 797 (6th Cir. 1998)). According to Defendants, "the issue of probable cause is inextricably intertwined with the issue of the unlawful entry" because "[i]f it was reasonable to believe there were exigent

---

[3]For the same reason, the district court's decision on the false arrest claim does not otherwise fall within the "small class" of nonfinal decisions immediately appealable under the collateral order doctrine. *Mitchell*, 472 U.S. at 524 (quoting *Cohen*, 337 U.S. at 546). Simply put, Defendants are not "able to satisfy the third element [of the collateral order doctrine] as this Court could effectively review the question of [liability for the arrest] after the district court render[s] a final judgment." *Crockett*, 316 F.3d at 578; *see also Harden v. Hillman*, 993 F.3d 465, 474–75 (6th Cir. 2021) (reviewing the district court's summary judgment resolution of a false arrest claim after other claims proceeded to trial and there was a final judgment entered by the district court).

circumstances to enter the apartment, it was reasonable to conclude that Williams needed to be restrained as a suspect upon entry." (Appellants Br. at 29–30.)

However, Defendants misunderstand what it means for appeals to be "inextricably intertwined." *Farm Lab.*, 308 F.3d at 549. Appeals are not "inextricably intertwined" merely because they "overlap in some respects." *Crockett*, 316 F.3d at 579. Rather, "[w]e have interpreted 'inextricably intertwined' to mean coterminous with, or subsumed in, the claim before the court on interlocutory appeal." *Farm Lab.*, 308 F.3d at 549 (quoting *Hadix v. Johnson*, 228 F.3d 662, 669 (6th Cir. 2000)). For example, in *Farm Labor Organizing Committee v. Ohio State Highway Patrol*, the district court's denial of summary judgment on the basis of qualified immunity to a police officer was properly appealed under the collateral order doctrine. *See id.* at 549. After determining that the district court properly denied summary judgment because "the facts show[ed] a violation of the Fourth Amendment," this Court exercised pendent appellate jurisdiction over the district court's grant of summary judgment to the plaintiff on the same claim because "there [was] nothing left for us to resolve . . . on the issue of liability." *Id.* at 550–51; *see also Brennan v. Township of Northville*, 78 F.3d 1152, 1158 (6th Cir. 1996) (exercising pendent appellate jurisdiction over the district court's grant of summary judgment to the plaintiff because "the judgment for [plaintiff] simply [could not] stand" based on the reversal of the district court's denial of summary judgment to defendants); *Stojcevski v. Macomb County*, 827 F. App'x 515, 524 (6th Cir. 2020); *Wrubel v. Bouchard*, 65 F. App'x 933, 938–39 (6th Cir. 2003).

Contrary to Defendants' assertion, "resolution of [Defendants'] interlocutory appeal of the [unlawful entry] issue does not necessarily resolve the [Defendants'] interlocutory appeal of the" false arrest issue. *Crockett*, 316 F.3d at 579. As will be explained below, resolution of the unlawful entry claim turns on whether Defendants had "an objectively reasonable basis for believing that an occupant [was] seriously injured or imminently threatened with such injury." *Brigham City v. Stuart*, 547 U.S. 398, 400 (2006). But whether Defendants had probable cause to arrest Williams depends on whether, at the time of the arrest, "the facts and circumstances within [their] knowledge [were] sufficient to inform 'a prudent person, or one of reasonable caution,' that [Williams] 'ha[d] committed, [was] committing, or [was] about to commit an

offense.'"   *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).  In other words, even if we were to hold that Defendants reasonably believed that someone within Apartment 103 needed emergency aid, once inside, Defendants still had to have probable cause to believe that Williams committed a crime.  So if the scene within the home demonstrated that Defendants were mistaken about the existence of an emergency, that Williams was the victim of the events giving rise to the emergency, or that the emergency did not give rise to criminal liability, Defendants would lack probable cause to arrest Williams even if they were allowed to enter the apartment.[4]   *See Elliot*, 497 F.3d at 652 (explaining that even if officers are entitled to search a home, they can still be liable for rights violated during the search).   Therefore, Williams' false arrest claim is not "subsumed in" Plaintiffs' unlawful entry claim, and, accordingly, it would be inappropriate for us to exercise pendent appellate jurisdiction in this case.  *Farm Lab.*, 308 F.3d at 549 (quoting *Hadix*, 228 F.3d at 669).

## II.  Merits

Because we lack jurisdiction over Defendants' appeal from the district court's grant of summary judgment to Williams on his false arrest claim, we review only the district court's denial of summary judgment to Defendants on Plaintiffs' unlawful entry claim and Mitchell's excessive force claim.

This Court reviews a district court's summary judgment disposition *de novo*.  *See See v. City of Elyria*, 502 F.3d 484, 490 (6th Cir. 2007); *Rocheleau v. Elder Living Const., LLC*, 814 F.3d 398, 400 (6th Cir. 2016).  "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Payne v. Novartis*

---

[4]On the merits of the false arrest claim, Defendants abandon the novel (and incorrect) argument that police have probable cause to arrest anyone in a home that they lawfully enter, and instead argue that they had probable cause to arrest Williams because he failed to comply with an order given to him by Armil.  Rephrasing their defense to the false arrest claim in this manner does not change the analysis on whether this Court should exercise pendent appellate jurisdiction over the claim.  Even if we were to hold that Defendants lawfully entered Apartment 103 without a warrant, we would still need to determine whether Armil gave Williams a lawful order, whether Williams failed to comply with the order, and whether that failure violated Michigan law—all issues separate from the analysis of the unlawful entry claim.

*Pharm. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(a), (c)). "The moving party bears the burden of showing that no genuine issues of material fact exist." *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 516–17 (6th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986)). "In reviewing a decision on a motion for summary judgment, we view the factual evidence and draw all reasonable inferences in favor of the non-moving party." *City of Elyria*, 502 F.3d at 491. "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne*, 767 F.3d at 530 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Thus, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)); *see also Moderwell v. Cuyahoga County*, 997 F.3d 653, 659–660 (6th Cir. 2021). "Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (citing *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006)). That is, although on summary judgment this Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party, when a defendant raises the defense of qualified immunity in a motion for summary judgment, the plaintiff must show that those facts and inferences would allow a reasonable juror to conclude that the defendant violated a clearly established constitutional right. *See Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020).

**A. Plaintiffs' Unlawful Entry Claim**

*1. Violation of Plaintiffs' Fourth Amendment Rights*

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend IV. "Although the text of the Fourth Amendment does not specify when a search warrant must be obtained, [the Supreme] Court has inferred that a warrant must generally be secured." *Kentucky v. King*, 563 U.S. 452, 459 (2011). The Supreme Court has also explained that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585–86 (1980) (quoting *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972)); *see also Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961))). Therefore, "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971)). But "the Fourth Amendment does not prohibit all unwelcome intrusions 'on private property,'—only 'unreasonable' ones." *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021) (quoting *Jardines*, 569 U.S. at 6). Accordingly, even for searches and seizures within a home, "the warrant requirement is subject to certain exceptions." *Brigham City*, 547 U.S. at 403.

"One well-recognized exception applies when 'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *King*, 563 U.S. at 460 (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). "The exception enables law enforcement officers to handle 'emergenc[ies]'— situations presenting a 'compelling need for official action and no time to secure a warrant.'" *Lange v. California*, 141 S. Ct. 2011, 2017 (2021) (quoting *Riley v. California*, 573 U.S. 373, 402 (2014); *Missouri v. McNeely*, 569 U.S. 141, 149 (2013)). "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened

with such injury." *Brigham City*, 547 U.S. at 403. "Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* (citing *Mincey*, 437 U.S. at 392); *see also Caniglia*, 141 S. Ct. at 1599.

"To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, this Court looks to the totality of circumstances." *McNeely*, 569 U.S. at 149 (citing *Brigham City*, 547 U.S. at 406). The "'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam) (citing *Brigham City*, 547 U.S. at 404–05). Rather, "it requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid." *Id.* (cleaned up). And "the fact-specific nature of the reasonableness inquiry[], demands that we evaluate each case of alleged exigency based on its own facts and circumstances." *McNeely*, 569 U.S. at 150 (internal quotations and citations omitted); *see also Lange*, 141 S. Ct. at 2018.

The parties agree that Defendants made a warrantless entry into Plaintiffs' home.[5] They also agree that the constitutionality of Defendants' entry turns on whether there was an exigent circumstance—specifically, the emergency aid exception to the warrant requirement. Thus, at the first prong of the qualified immunity analysis, to determine whether the entry was permitted under the Fourth Amendment, the inquiry focuses on whether, at the time of the entry, Defendants had an objectively reasonable basis for believing than an occupant of the apartment was "seriously injured or threatened with such injury." *Brigham City*, 547 U.S. at 403.

Under Plaintiffs' version of the facts, we hold that a reasonable juror could find that they did not. To start, *Florida v. J.L.*, 529 U.S. 266 (2000), demonstrates that the anonymous tip alone did not provide such an objectively reasonable basis. In *J.L.*, "an anonymous caller reported to the Miami–Dade Police that a young black male standing at a particular bus stop and

---

[5]Because Williams was "an overnight guest" in Mitchell's home, Defendants do not dispute that he had a "legitimate expectation of privacy in his host's home," and, accordingly, that both Plaintiffs have standing to assert a Fourth Amendment unlawful entry claim. *Minnesota v. Olson*, 495 U.S. 91, 98 (1990); *see also Watson v. Pearson*, 928 F.3d 507, 511 (6th Cir. 2019). For ease of reference, we refer to "Plaintiffs' home."

wearing a plaid shirt was carrying a gun." *Id.* at 268. Responding officers saw a young man matching the description at the bus stop but, "[a]part from the tip, the officers had no reason to suspect . . . illegal conduct." *Id.* Nonetheless, the officers stopped and frisked the man. *See id.* In the context of whether the anonymous call provided reasonable suspicion, pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), for police to seize the man in public, the Supreme Court explained that "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Id.* at 270 (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990)). Only when an "anonymous tip [is] suitably corroborated" does it "exhibit[] 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *Id.* (quoting *White*, 496 U.S. at 327). Otherwise, "any person seeking to harass another [could] set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call." *Id.* at 272. Accordingly, even though "[t]here really was a young black male wearing a plaid shirt at the bus stop," the *J.L.* Court explained that the anonymous tip was not suitably corroborated because "[t]he anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *Id.* at 271.

In this case, the caller remained completely anonymous. *J.L.* therefore establishes that the anonymous tip alone was not sufficient to justify a warrantless entry into Plaintiffs' home. To be sure, *J.L.* indicated that certain dangerous circumstances, such as "a report of a person carrying a bomb," "might be so great as to justify a search even without a showing of reliability." *Id.* at 273. But the Supreme Court also explained that the level of Fourth Amendment protection assigned to the "quarters" matters. *Id.* at 274. And "the privacy interest at issue here is much greater than in *J.L.*" because "Defendants here relied on the anonymous 911 call to justify an invasion of the sanctity of a private dwelling ordinarily afforded the most stringent Fourth Amendment protection." *Kerman v. City of New York*, 261 F.3d 229, 236 (2d Cir. 2001) (cleaned up); *see also Schreiber v. Moe*, 596 F.3d 323, 330 (6th Cir. 2010) (declining to decide whether an anonymous call alone can provide the requisite indicia of exigency to enter a home

because police corroborated the call).  Thus, something more than just the anonymous call was needed to allow Defendants to enter Plaintiffs' home without a warrant.**6**

However, before entering Plaintiffs' home, Defendants learned that the anonymous caller had retracted her identification of Apartment 103 as the site of the alleged disturbance.  In the anonymous caller's second conversation with the 911 operator, she relayed that she was no longer "positive what apartment it was coming from."  (R. 22-3 at 8:13–8:17.)  Accordingly, the basis for Defendants' warrantless entry—the reason why Defendants arrived at the apartment building and sought entry into Apartment 103—became less certain before they entered Plaintiffs' home.  Even accepting the veracity of the anonymous caller's tip, the totality of the anonymous caller's two calls merely alleged that there had been a disturbance in an unknown area in the building.

Moreover, when Defendants eventually entered Plaintiffs' home, the anonymous caller's initial identification of Apartment 103 was insufficiently corroborated.  The only potentially positive indicium of the anonymous tip's reliability was the broken glass.  The anonymous caller mentioned hearing glass breaking, and broken glass from a window was found outside of Apartment 103.  But viewing the facts in the light most favorable to Plaintiffs, the broken window neither corroborated the identification of Apartment 103 nor provided an independent objectively reasonable basis to believe that someone within the apartment was seriously injured or threatened with serious injury.  As explained above, only the outer glass pane was broken; the inner pane was intact.  Likewise, Mitchell claimed that the person who had broken the outer pane had run away.  Therefore, the broken outer windowpane did not provide a basis for Defendants to enter Plaintiffs' home without a warrant.  At most, the broken window corroborated the combined allegation from the two anonymous calls—that there had been a disturbance in an unknown location in the building.

---

**6**See Kerman, 261 F.3d at 236 (holding that an anonymous call alone is not enough to demonstrate an exigent circumstance); *Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 111–12 (2d Cir. 2020) (same); *Storey v. Taylor*, 696 F.3d 987, 996 (10th Cir. 2012) (holding that an anonymous caller's "report of a loud argument—without more—that has ceased by the time an officer arrives, although relevant to the exigent circumstances inquiry, does not alone create exigent circumstances to justify a warrantless arrest"); *see also Johnson v. City of Memphis*, 617 F.3d 864, 869 (6th Cir. 2010) (explaining that "the combination of a 911 hang call," which demonstrates that someone from within the home had sought emergency services, "an unanswered return call, and an open door with no response from within the residence is sufficient to satisfy the exigency requirement").

Furthermore, a reasonable juror could find that the remaining information available to Defendants indicated that there was no emergency within Apartment 103. Although the anonymous caller mentioned screaming coming from Apartment 103, when Defendants arrived on the scene, while they also heard a woman scream, they thought they heard the screaming coming from a different apartment. Fegreus can be heard on the recording saying "we don't think it's coming from 103. We walked in, we heard yelling . . . . They're gonna check up there. [Elliott] thought he heard it upstairs." (R. 22-3 at 3:53–4:06.) And despite standing outside Plaintiffs' apartment for about eight minutes, Defendants did not hear any signs of a disturbance within. In fact, Fegreus called dispatch to confirm the reported apartment number because, as he reported to dispatch, "it's locked, and there's no answer and it's all quiet." (*Id.* at 6:23–6:27.) Nor did Defendants witness anything suspicious when they looked through the window to Apartment 103. Thus, the screaming from another apartment, the silence from Apartment 103, and the anonymous caller's inconsistent identification with respect to Apartment 103, together would allow a reasonable juror to conclude that if there was a disturbance in the building, it was not in Plaintiffs' home.

Additionally, police dispatch told Defendants that the "anonymous caller believes that the door to that apartment was kicked in before the screaming started." (R. 23-2 at 4:20–4:30.) One would expect to see some signs of forced entry on a door that had been kicked in. But Defendants determined that there was "no sign of forced entry to the front door" of Apartment 103. (R. 23-5 at PageID# 598.) Compounded by the screaming coming from a different apartment, the silence emanating from Plaintiffs' home, and the anonymous caller's retraction, viewing the evidence in the light most favorable to Plaintiffs, the lack of corroboration of the alleged forced entry indicated that the disturbance, if real, may have taken place in a different apartment.

Defendants argue that "[o]ther circumstances also alerted the Defendants to a potential danger inside Apt. 103, and add up to probable cause." (Appellants Br. at 51.) They argue that the amount of time it took for Mitchell to open the door, as well as Mitchell only opening the door slightly and using her knee to prevent them from opening it further, indicated danger within the apartment. However, Mitchell exercising her Fourth Amendment rights can hardly be

grounds for police to circumvent the core right protected by the Amendment. *See King*, 563 U.S. at 469–470 ("When law enforcement officers who are not armed with a warrant knock on a door . . . the occupant has no obligation to open the door or to speak. . . . And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time."); *see also Lange*, 141 S. Ct. at 2018 ("'Freedom' in one's own 'dwelling is the archetype of the privacy protection secured by the Fourth Amendment . . . .'" (quoting *Payton*, 445 U.S. at 587)); *Hopkins v. Bonvicino*, 573 F.3d 752, 765 (9th Cir. 2009) ("The mere fact that Hopkins did not answer the door cannot tip the balance in the officers' favor, since nothing requires an individual to answer the door in response to a police officer's knocking.").

Defendants' remaining arguments run the gamut from relying on dispatch indicating that the "conduct" needed "immediate attention" to claiming that they had an objectively reasonable basis to believe that there was an emergency because only a woman opened the door even though there had been reports of a man and a woman screaming. (Appellants Br. at 51.) But as explained above, by the time they entered Apartment 103, the information known to Defendants would allow a reasonable juror to find that the officers did not have a reasonable basis to think that there had been a disturbance in Apartment 103.

The Supreme Court cases relied upon by Defendants—*Brigham City v. Stuart*, 547 U.S. 398 (2006), and *Michigan v. Fisher*, 558 U.S. 45 (2009)—confirm the lack of an exigent circumstance in this case. In *Brigham City*, "[t]he officers were responding, at 3 o'clock in the morning, to complaints about a loud party." 547 U.S. at 406. When they arrived at the house, they heard "an altercation occurring, some kind of a fight." *Id.* People were yelling "stop, stop" and "get off me." *Id.* Because the "noise seemed to be coming from the back of the house; after looking in the front window and seeing nothing, the officers proceeded around back to investigate further." *Id.* From the back of the house, the officers were able to see inside. *See id.* Specifically, they saw a child, "fists clenched, [who] was being held back by several adults." *Id.* They then saw the child "break[] free and strike[] one of the adults in the face, sending the adult to the sink spitting blood." *Id.* "The other adults continued to try to restrain the juvenile, pressing him up against a refrigerator with such force that the refrigerator began moving across

the floor." *Id.* at 401. "At this point," an officer entered the home without a warrant. *Id.* "In these circumstances," the Supreme Court explained, "the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning." *Id.* at 406.

Similarly, in *Fisher*, when responding "to a complaint of a disturbance" at a residence where a man was "going crazy," officers "found a household in considerable chaos: a pickup truck in the driveway with its front smashed, damaged fenceposts along the side of the property, and three broken house windows, the glass still on the ground outside." 558 U.S. at 45–46. Officers also saw "blood on the hood of the pickup and on clothes inside of it, as well as on one of the doors to the house." *Id.* at 46. Inside the house, through a window, the officers saw a man with "a cut on his hand . . . screaming and throwing things." *Id.* An officer then entered the house without a warrant. *See id.* The Supreme Court held that "the emergency aid exception, as in *Brigham City*, dictates that the officer's entry was reasonable." *Id.* at 48. In both cases, the Supreme Court explained, (1) the police officers "were responding to a report of a disturbance," (2) "when they arrived on the scene they encountered a tumultuous situation in the house," and (3) "the officers could see violent behavior inside." *Id.*

By contrast, while Defendants were similarly responding to a report of a disturbance, when they arrived on the scene, there was no indication of a tumultuous situation in Plaintiffs' home and Defendants did not witness any violent behavior inside the apartment. Furthermore, as explained above, by the time Defendants entered Plaintiffs' apartment, there was ample reason to doubt the report of the disturbance. The anonymous caller had explained that she was no longer certain which apartment she had heard the screaming coming from. Officers heard screaming coming from another apartment. The officers who had looked through the window had not seen any signs of a disturbance. There were no signs of a forcible entry. And Mitchell had told Defendants that there was no disturbance in the apartment. Thus, *Brigham City* and *Fisher* demonstrate that a reasonable juror could conclude that Defendants lacked an objectively reasonable basis for relying on the emergency aid exception to enter Plaintiffs' home without a warrant.

Defendants also point to two Sixth Circuit cases. Again, both are unavailing. In *Thacker v. City of Columbus*, we summarized the information available to the officers when they made the decision to enter a home without a warrant:

> Someone had placed a 911 call reporting an emergency—a cutting or stabbing— at the residence. [Plaintiff] Thacker answered the door shirtless, with blood on his legs and boxer shorts. It was apparent that Thacker himself was injured, as the officers could see that he was bleeding from a cut on his hand. The cut was deep enough to require stitches, but Thacker had wrapped his shirt around his hand to slow the profuse bleeding. Immediately, Thacker acted belligerently and used profanity. He appeared intoxicated. Thacker failed to provide any explanation for the injury. Instead, he demanded assistance from the paramedics, who were waiting outside for the officers to tell them that it was safe to enter. "When the door was opened," Officer Stack could see the kitchen area, including the kitchen table, to the right and the main living room area to the left. In the kitchen, he could see a broken beer bottle on the floor, a hole in the kitchen wall a "couple feet off the floor," and liquid splashed on the wall and spilled on the floor.

328 F.3d 244, 254 (6th Cir. 2003). We explained that, while it was a "close question, . . . the dual needs of safeguarding the paramedics while tending to Thacker's injury, created exigent circumstances." *Id.* If *Thacker*, where police saw a person bleeding profusely from a deep wound, there were signs of "an altercation or an accident" in the home, and there was a need to protect the paramedics from a person whose "demeanor and attitude indicated" that he "could have posed a threat to the[ir] safety," was a "close call," a reasonable juror could surely conclude that there was no exigent circumstance here where Defendants saw absolutely no signs of danger to anyone. *Id.* at 255.

Finally, this case bears little resemblance to *Stricker v. Township of Cambridge*, 710 F.3d 350 (6th Cir. 2013). There, a mother "called 911 from her residence to report that her [son] had 'overdosed on some kind of drugs.'" *Id.* at 354. Officers on the scene knew that the son was a "heroin user" from prior incidents, the father told them that the son "was not well," and they saw that the son "could not focus, did not appear alert, and was unable to stand on his own." *Id.* at 360–61. We held that "[a]ll of these facts served to confirm the reported drug overdose" and made it "objectively reasonable for the officers to believe a medical exigency existed when they had affirmative evidence that someone in the home needed immediate aid." *Id.* at 361. Unlike in *Stricker*, Defendants arrived on the scene due to an anonymous call and the information

possessed by Defendants provided no indication that anyone in Plaintiffs' home required immediate medical attention. Thus, *Stricker* does not support Defendants' cause.

In sum, viewing the facts in the light most favorable to Plaintiffs, a reasonable juror could find that Defendants' warrantless entry into Plaintiffs' home was unconstitutional. *See Carlson v. Fewins*, 801 F.3d 668, 676 (6th Cir. 2015) ("Longstanding precedent in this circuit leaves the factual question of exigent circumstances to the jury in a civil case.").

### 2. *Clearly Established Right*

At the second prong of the qualified immunity analysis, Plaintiffs bear the burden of showing that Defendants' unconstitutional conduct violated clearly established law. *See Barton*, 949 F.3d at 950. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). There does not need to be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Wesby*, 138 S. Ct. at 590. The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Id.* (quoting *Anderson*, 483 U.S. at 641). But "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "Thus, when 'no

reasonable . . . officer could have concluded' that the challenged action was constitutional, the Supreme Court has held that there does not need to be a case directly on point." *Moderwell*, 997 F.3d at 660 (quoting *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020)); *see also McCoy v. Alamu*, 141 S. Ct. 1364 (2021).

In *Barton v. Martin*, we considered whether the emergency aid exception applied to a situation where an officer made a warrantless entry into a home based on information about "a suspect who possibly shot a stray cat, but ha[d] denied doing so, and [was] inside his home but cooperating with police." 949 F.3d at 948. After concluding that the officer's warrantless entry violated the Fourth Amendment, we explained that "it was clearly established that warrantless entry into a home without an exception to the warrant requirement violated clearly established law." *Id.* at 949 (citing *Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006)). Because there was "not an exigent circumstance posing a risk to the safety of the officers or bystanders," we held that "bedrock Fourth Amendment principles . . . demonstrate that [the officer's] forced warrantless entry into [the plaintiff's] home was presumptively unreasonable, and [the officer] had no objectively reasonable basis for believing the warrantless entry was supported by exigent circumstances. Therefore, [the officer] is not entitled to qualified immunity on the unlawful entry claim." *Id.*

The same is true here. As explained above, accepting Plaintiffs' version of the facts, a reasonable jury could find that Defendants' warrantless entry into Plaintiffs' home violated the Fourth Amendment's prohibition against unreasonable searches. And if the jury finds that there was no exigent circumstance, then, as in *Barton*, Defendants' warrantless entry into Plaintiffs' home violated clearly established law. Accordingly, Defendants are not entitled to qualified immunity on Plaintiffs' unlawful entry claim.

**B. Mitchell's Excessive Force Claim**

*1. Violation of Mitchell's Fourth Amendment Rights*

The preceding section focused on whether Defendants' warrantless entry into Plaintiffs' apartment was unreasonable so as to violate the Fourth Amendment's protection "against unreasonable searches and seizures." U.S. Const. amend IV. But, under the Fourth Amendment,

"the 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (citing *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985)). Thus, through an excessive force claim brought under § 1983, "physically intrusive governmental conduct" that "arises in the context of an arrest or investigatory stop of a free citizen" can be challenged as violating the Fourth Amendment. *Id.* at 394–95.

As explained above, when Mitchell opened her door, she "put [her] knee to the door just for protection so that the door wouldn't be all the way opened." (R. 22-12 at PageID# 514.) Mitchell asserts that Defendants used excessive force when they forcibly pushed open the door in a manner that caused her knee to bleed and left a permanent scar. To determine whether force used by law enforcement was excessive, we "apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Brown v. Lewis*, 779 F.3d 401, 418 (6th Cir. 2015) (quoting *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013)). This approach entails "balanc[ing] the consequences to the individual against the government's interests in effecting the seizure." *Morrison v. Bd. of Tr. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (quoting *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002)). "Three factors guide the reasonableness test: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight.'" *Brown*, 779 F.3d at 418 (quoting *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013)). "Though important, these factors are not the end of the matter, as the court ultimately must determine 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Martin*, 712 F.3d at 958 (quoting *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005)). Moreover, "[t]his standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett*, 310 F.3d at 944 (citing *Graham*, 490 U.S. at 396).

Defendants argue that, as a matter of law, the force they used to open the door to Mitchell's apartment was not excessive because it only caused *de minimis* injury to Mitchell. However, "[t]he 'extent of the injury inflicted' is not 'crucial to an analysis of a claim for excessive force in violation of the Fourth Amendment.'" *Coley v. Lucas County*, 799 F.3d 530, 539 (6th Cir. 2015) (quoting *Morrison*, 583 F.3d at 407); *see also Baskin v. Smith*, 50 F. App'x 731, 737 n.2 (6th Cir. 2002). "We look instead to whether 'gratuitous violence' has been inflicted." *Coley*, 799 F.3d at 539 (quoting *Pigram ex rel. Pigram v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006)); *see also Morrison*, 583 F.3d at 407.

For example, in *Miller v. Sanilac County*, the plaintiff brought an excessive force claim based on allegations that a police officer "effected the arrest by spinning him around, kicking his feet apart, and slamming him against his vehicle." 606 F.3d 240, 246 (6th Cir. 2010). But the plaintiff conceded "that he was not hurt by any of these actions." *Id.* On the grounds that "[i]t is not objectively unreasonable for an officer to place an individual under arrest using force that does not cause harm," the district court granted summary judgment to the officer. *Id.* at 252. We reversed because "a plaintiff may 'allege use of excessive force even where the physical contact between the parties did not leave excessive marks or cause extensive physical damage.'" *Id.* (quoting *Morrison*, 583 F.3d at 407). And because "the offense [was] non-violent, the arrestee posed no immediate safety threat, and the arrestee had not attempted to escape and was not actively resisting," we held that "a jury could reasonably find that slamming an arrestee into a vehicle constitutes excessive force." *Id.* at 253–54. Accordingly, Defendants incorrectly seek summary judgment on the basis that a Fourth Amendment excessive force claim contains a *de minimis* injury requirement.[7]

Defendants also appear to alternatively argue that the force was reasonable because Mitchell was blocking the door from opening and they had to act "swiftly to ensure the safety of everyone inside the apartment." (Appellants Br. at 60.) But as explained above, a reasonable

---

[7]Furthermore, even if there is a *de minimis* injury requirement, Mitchell's injuries were more than *de minimis* because she suffered a bloody knee and a permanent scar from the alleged excessive force. *See Carlton v. Turner*, No. 05-1009, 2006 WL 955886, at *2 (6th Cir. Apr. 12, 2006) (holding that force used against a convicted prisoner was more than *de minimis* because, even though the "resulting injury was 'minor,'" the force "drew blood").

juror could find that when Defendants forced open Mitchell's door, the information known to them did not support a conclusion that there was a "real exigency" within Mitchell's home that required a warrantless entry. *King*, 563 U.S. at 470. Therefore, a reasonable jury could conclude that the force used by Defendants to forcibly open Mitchell's door while she lawfully attempted to assert her Fourth Amendment right to be free from an unreasonable search and seizure was "gratuitous," and accordingly, violated her Fourth Amendment right to be free from excessive force. *Coley*, 799 F.3d at 539; *see also Martin*, 712 F.3d at 960.

### 2. Clearly Established Right

Having determined that Mitchell has made a sufficient showing that Defendants violated her Fourth Amendment right to be free from excessive force, the inquiry turns to whether the right was clearly established. As explained above, it is "clearly established that warrantless entry into a home without an exception to the warrant requirement violate[s] clearly established law." *Barton*, 949 F.3d at 949 (citing *Armstrong*, 432 F.3d at 700). Likewise, it is clearly established that "[g]ratuitous violence is never reasonable" because "there is 'simply no governmental interest' justifying gratuitous violence." *Walters v. Stafford*, 317 F. App'x 479, 491 (6th Cir. 2009) (citing *Phelps v. Coy*, 286 F.3d 295, 302 (6th Cir. 2002)); *see also Graham*, 490 U.S. at 395 (explaining that the use of unreasonable force while effecting the "'seizure' of a free citizen" violates the Fourth Amendment).

If Defendants forcibly entered Mitchell's home armed with neither a warrant nor an exception to the warrant requirement, the use of any amount of force to effectuate this unconstitutional action constituted unreasonable "gratuitous violence." *Walters*, 317 F. App'x at 491; *see also Taylor*, 141 S. Ct. at 53 (explaining that qualified immunity is inappropriate when "any reasonable officer should have realized" that their conduct "offended the Constitution."); *Moderwell*, 997 F.3d at 662 (same); *Brosseau*, 543 U.S. at 199 (explaining that, in "an obvious [excessive force] case," *Graham* and *Garner* "alone" can "offer a basis" for denying qualified immunity); *cf. Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006) (explaining that it is clearly established that police cannot use gratuitous violence when there is "no safety risk"). Put differently, "[o]f course, if Defendant[s] had no right to be inside the home, then [they] had no right to use force." *Hickey v. Hayse*, 188 F. Supp. 2d 722, 728

(W.D. Ky. 2001). Accordingly, assuming the absence of exigent circumstances, viewing the evidence in the light most favorable to Mitchell, when Defendants forcibly slammed Mitchell's door open and hit her knee, they violated her clearly established Fourth Amendment right to be free from excessive force.

**CONCLUSION**

For these reasons, we **DISMISS** Defendants' appeal of the district court's grant of summary judgment to Williams on his false arrest claim for lack of jurisdiction and **AFFIRM** the district court's denial of Defendants' motion for summary judgment on Plaintiffs' claim for unlawful entry and Mitchell's claim for excessive force.