NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0282n.06

No. 25-5078

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jun 29, 2026
KELLY L. STEPHENS, Clerk

DANA LITTLE,

     Plaintiff-Appellant,

v.

CITY OF OWENSBORO, KENTUCKY;
ART EALUM, Individually; WESLEY
DUNN, Individually,

     Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF
KENTUCKY

OPINION

Before: WHITE, STRANCH, and MURPHY, Circuit Judges.

STRANCH, J., delivered the opinion of the court in which MURPHY, J., concurred. WHITE, J. (pp. 15–21), delivered a separate dissenting opinion.

**JANE B. STRANCH, Circuit Judge.** Dana Little sustained an injury during an arrest by an officer of the Owensboro Police Department. She brought this action under 42 U.S.C. § 1983 and state tort law against the arresting officer, the police chief, and the City of Owensboro, Kentucky. The district court granted the Defendants' motion for summary judgment based on federal qualified immunity and immunity under Kentucky law. For the reasons stated below, we **AFFIRM** the district court's decision.

## I.   BACKGROUND

On the morning of May 26, 2020, a man named Justin Kyle came to Ms. Little's home and parked in her driveway, demanding to see an individual he mistakenly believed would be present.

Neither Ms. Little nor her 23-year-old son Keon Little,[1] who lived with her at the time, knew Kyle. The Littles confronted Kyle in his vehicle and repeatedly asked him to leave their property. A noisy argument ensued, during which Kyle threatened them. Ms. Little, in response, struck Kyle's vehicle with a baseball bat, and Keon shouted profanities and threatened to shoot him. Kyle called the Owensboro Police Department (OPD), requesting police to the scene and relaying what had transpired, including Keon's shooting threat.

OPD dispatched Officer Wesley Dunn to Ms. Little's residence to respond. According to the dispatch log, the information relayed to Officer Dunn included that an altercation was taking place between the caller and a woman who was hitting his car with a baseball bat, that his windshield was "busted," and that the woman's son came out of the house and threatened to shoot the caller. Officer Dunn testified at his deposition that, by the time he arrived, it appeared to him that the situation between Kyle and the Littles had de-escalated:

> Q: [W]hen you arrived on the scene, the situation had already gotten pretty escalated, correct? Tempers were—
> A: It had; and then they were calm when I pulled up, it seemed.
> Q: Who was calm?
> A: Everybody.

R. 77-1, PageID 497. Tensions began to escalate between Officer Dunn and the Littles, however, when he began his investigation by speaking with Kyle. According to Officer Dunn, his duty was to speak with Kyle first because he was dispatched to address Kyle's complaint. From the Littles' perspectives, it was an injustice, and possibly motived by racial bias, for Officer Dunn to attend to Kyle first when he had victimized the Littles by refusing to leave their property; they yelled and swore at Officer Dunn in protest.

---

[1] For clarity, the court will refer to Dana Little as "Ms. Little" and Keon Little as "Keon."

Officer Dunn then asked the Littles to go back to their porch while he spoke with Kyle. They stepped back onto their yard and away from Kyle, though they did not go all the way back to the porch, and Keon continued to protest. Ms. Little encouraged Keon to calm down and go back to the house, but he continued. Officer Dunn stated that Keon was under arrest for disorderly conduct, but Keon responded by going into the home. Officer Dunn attempted to follow, but as he tried to open the front door, Ms. Little stood behind him, put her hand on the door, and said that he couldn't enter the home without a warrant. Officer Dunn then stated that Ms. Little was under arrest for hindering prosecution (as Dunn recounts things) or disorderly conduct (as Ms. Little remembers things).

As Officer Dunn attempted to arrest Ms. Little, a loud struggle ensued on the porch of the home. A neighbor's doorbell camera picked up some audio (but no video footage) of this struggle. After Officer Dunn told Ms. Little that she was under arrest, Ms. Little yelled, "no, I'm not." R. 104, Doorbell Video Recording 20:30-55; *see* R. 83-5, Defs.' Mem. Supp. Mot. Summ. J. Ex. E, Timeline, PageID 980. Over the span of the following approximately twenty seconds, Officer Dunn ordered Ms. Little to "turn around" multiple times and yelled "give me your hands" and "stop resisting." R. 104, Doorbell Video Recording 20:30-55. Ms. Little yelled loudly in response multiple times. *Id.* Officer Dunn then grabbed Ms. Little's wrist and attempted an arm bar takedown maneuver.[2] After placing Ms. Little in the arm bar, Officer Dunn began performing the takedown part of the maneuver—but when he attempted to do so, he instead "lost his balance and fell on her." Appellant's Br. 9. The fall caused Ms. Little to dislocate her elbow. By this point,

---

[2] There are two steps to performing an arm bar takedown. First, the officer gains control of a subject by grabbing her wrist in a certain manner. Then, while still gripping the subject's wrist, the officer applies increasing pressure on her arm; this encourages the subject to go to the ground to avoid pain, because resisting the takedown would cause the subject to experience pain in proportion to the resistance and the officer's application of pressure. Because of the way this second step works, an arm bar takedown is considered a "pain compliance technique."

another officer, Officer Hammonds, had arrived at the residence. Ms. Little and Keon were placed under arrest, and Officer Dunn called an ambulance for Ms. Little. All of these events occurred within approximately three minutes of Officer Dunn's arrival at Ms. Little's residence.

Keon subsequently pleaded guilty to disorderly conduct (second degree). Ms. Little was charged with disorderly conduct (second degree), hindering prosecution or apprehension (second degree), and criminal mischief (first degree). These charges remained pending as of the briefing of this appeal.

Ms. Little filed suit in the United States District Court for the Western District of Kentucky naming as defendants Officer Dunn, the City of Owensboro, and the OPD police chief, Art Ealum. R. 1, Compl., PageID 2. She brought federal claims pursuant to 42 U.S.C. § 1983—including claims of excessive force, malicious prosecution, and denial of due process in violation of her constitutional rights—as well as state law tort claims. R. 1, PageID 7–8. Ms. Little moved for partial summary judgment on Dunn's liability with respect to her excessive force claim; Defendants moved for summary judgment on all claims, arguing that Officer Dunn was entitled to qualified immunity on Ms. Little's excessive force claim and entitled to immunity under Kentucky law on her state law claims. The district court denied Ms. Little's motion and granted Defendants' motion. The district court found that Officer Dunn was entitled to federal qualified immunity on Ms. Little's excessive force claim and was entitled to immunity under Kentucky law on her state law claims.[3] The court also entered summary judgment in favor of the City of Owensboro and

---

[3] The district court noted that the parties did not "address a Section 1983 claim for malicious prosecution in their motions for summary judgment." R. 106, Mem. Op. & Order, PageID 2137 n.7. Nevertheless, the district court granted summary judgment in Defendants' favor on this claim on the ground that Ms. Little "has not stated an adequate claim for malicious prosecution under Section 1983, as she has not provided facts that she 'obtained a favorable termination of [her] underlying criminal prosecution.'" *Id.* (alteration in original) (quoting *Thompson v. Clark*, 596 U.S. 36, 39 (2022)). Neither the parties nor the district court separately addressed a § 1983 due process claim at summary judgment.

Chief Ealum, concluding that there was no municipal liability because there was no underlying constitutional or state law violation. Ms. Little timely appealed, arguing that the district court erred in granting summary judgment to Defendants on her excessive force claim and state law claims.

## II.   STANDARD OF REVIEW

"We review the district court's grant of summary judgment on qualified immunity grounds *de novo*." *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013); *N. Ky. Water Dist. v. Carucci*, 600 S.W.3d 240, 243 (Ky. 2019) (holding the same as to government immunity under Kentucky law). Summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]e view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in her favor." *Hicks v. Scott*, 958 F.3d 421, 430 (6th Cir. 2020).

## III.   ANALYSIS

We address first whether Officer Dunn is entitled to qualified immunity on the federal claims, as the outcome of this inquiry has significant bearing on Ms. Little's state law claims. Indeed, "the viability of [a plaintiff's] municipal liability and state-law claims is closely intertwined with the availability of qualified immunity" for the arresting officer. *Id.*

### A.     42 U.S.C. § 1983 Claims Against Officer Dunn

"The qualified-immunity doctrine shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013). A defendant is entitled to summary judgment "unless the facts, when viewed in the light most favorable to the plaintiff, would permit a

reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011). We may answer these questions in either order, and "if either one is answered in the negative, then qualified immunity protects the officer from civil damages." *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015).

Ms. Little brings a claim against Officer Dunn under 42 U.S.C. § 1983, alleging that the arrest involved excessive force in violation of her Fourth Amendment rights. The Fourth Amendment's protection against unreasonable seizures prohibits law enforcement officers from using excessive force "in the course of an arrest, investigatory stop, or other 'seizure.'" *Graham v. Connor*, 490 U.S. 386, 395 (1989). To determine whether an arresting officer's use of force was unconstitutional, the touchstone is reasonableness—as is the case for all questions arising under the Fourth Amendment. *See United States v. Saucedo*, 226 F.3d 782, 789 (6th Cir. 2000). We apply an "objective-reasonableness standard, which depends on the facts and circumstance of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

An officer has "the right to use some degree of physical coercion" to make an arrest, but the level of force must be reasonable in light of the circumstances. *Fox*, 489 F.3d at 236 (quoting *Graham*, 490 U.S. at 396). In analyzing the reasonableness of an officer's use of force, we consider (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the officer or others, and (3) whether the suspect actively resisted arrest. *See Graham*, 490 U.S. at 396. The *Graham* factors are "non-exhaustive." *Goodwin*, 781 F.3d at 321. When it is reasonable for an officer to use force, the force must be proportional: "[o]fficers may use only an amount of

force that is objectively reasonable under the circumstances." *Dunn v. Matatall*, 549 F.3d 348, 355 (6th Cir. 2008). The Supreme Court recently clarified in *Barnes v. Felix* that the excessive force inquiry must go beyond the immediate "moment" of threat as it is necessary to consider the full context of the relevant circumstances, including how the "facts and circumstances" preceding a use of force "may bear on how a reasonable officer would have understood and responded to later ones." 605 U.S. 73, 80 (2025). This inquiry then answers the ultimate question whether "the totality of the circumstances" justified the officer's use of force. *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985).

Here, we begin with the first and third *Graham* factors—the severity of the crime and whether Ms. Little resisted arrest—as those are the more straightforward on this record. Regarding the first factor, Officer Dunn informed Ms. Little that she was under arrest either for hindering the prosecution of Keon or for disorderly conduct, both of which are misdemeanors. *See* KRS §§ 520.130, 525.060. Because neither of these offenses is severe, the first factor weighs in Ms. Little's favor. As to the third factor, the record evidence suggests that Ms. Little exhibited at least some resistance to arrest. After being informed that she was under arrest, Ms. Little repeatedly yelled at Officer Dunn, screaming: "no I'm not," "for what, I didn't do nothing," and "you serious?" R. 104, Doorbell Video Recording 20:30-55. At the same time, Officer Dunn can be heard ordering Ms. Little to "give [him] her hands," "turn around," and "stop resisting." *Id.* We have found "active resistance" when a suspect exhibits "some outward manifestation—either verbal or physical" that "suggest[s] volitional and conscious defiance" after being told that he or she is under arrest. *See Shumate v. City of Adrian*, 44 F.4th 427, 446 (6th Cir. 2022) (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 533 (6th Cir. 2013)); *cf. Browning v. Edmonson County*, 18 F.4th 516, 526–27 (6th Cir. 2021) ("Whatever 'active' means, it has to mean something

more than mere silence and inaction."). Because Ms. Little exhibited "verbal hostility" and "refusal or resistance to being handcuffed," after being told that she was under arrest, *Browning*, 18 F.4th at 524, 527 (citation omitted), her actions are consistent with active resistance. On this record, the third *Graham* factor favors Officer Dunn.

In considering the second factor, whether Ms. Little posed a safety threat to Officer Dunn, we note some peculiarities in how the parties' arguments relate to the *Graham* framework. Officer Dunn has never suggested that he believed Ms. Little, by herself, was a threat to his safety. At deposition he affirmed that, before he applied the arm bar takedown, Ms. Little had never threatened to hurt him, that he never heard her threaten anyone else, and that he never saw her with a weapon. He also testified that during his confrontation with Keon, Ms. Little was trying to diffuse the situation by encouraging Keon to comply with his commands. Officer Dunn's contention is that his use of force was necessary because Ms. Little was impeding him from entering the house and arresting Keon—who he had reason to believe might be trying to get a gun from the house. In other words, Officer Dunn's theory is that Ms. Little posed a safety threat because *Keon* posed a safety threat.

Because Officer Dunn did not have a warrant to enter Ms. Little's home, however, his theory necessarily touches on Fourth Amendment case law addressing the warrant requirement and its exceptions. The theory sounds in the exigent circumstances exception, which provides that "the existence of an emergency situation, demanding urgent police action, may excuse the failure to procure a search warrant." *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (citation modified). The district court's analysis implicated the exigent circumstances doctrine, positing that because Officer Dunn "was certainly aware of the potentially escalating conflict among Dana, Keon, and Kyle," "a reasonable officer in this situation could determine that Dana's blocking the

entry into her home posed an immediate threat." R. 106, Mem. Op. & Order, PageID 2142–43. Although Ms. Little did not specifically argue that Officer Dunn violated the warrant requirement, we address our warrantless entry doctrines to the extent they relate to Officer Dunn's justifications for his use of force.

Officer Dunn contends he needed to enter the house without a warrant to prevent Keon from obtaining a weapon. Assessing the reasonableness of this concern requires review of the totality of the circumstances relevant to Officer Dunn's use of force, from the dispatch call to the arm bar takedown. *See Barnes v. Felix*, 605 U.S. at 80. We have held that "[a] 911 call, vaguely reporting an altercation, is not enough to justify an officer's warrantless entry into a home." *Reed v. Campbell Cnty., Ky.*, 80 F.4th 734, 744 (6th Cir. 2023). Here, dispatch told Officer Dunn that an altercation was taking place between the caller and a woman with a baseball bat, and that the woman's son came out of the house and threatened to shoot the caller. The dispatch call did not indicate, however, that Keon had brandished a gun, nor that anyone indicated there was a gun inside the house. In addition, Officer Dunn testified that everyone had apparently calmed down by the time he arrived at the scene, which suggests that any threat Keon posed initially may have dissipated somewhat by the time he arrived.

There are ambiguities or conflicting accounts in the record regarding what transpired next. First, although the parties agree that Officer Dunn initially ordered the Littles to return to the porch, there is some disagreement regarding further directives to Keon. When the verbal conflict between Keon and Officer Dunn was escalating, Ms. Little was urging Keon to go back to the house. Ms. Little also testified that Officer Dunn said, "Take your ass in the house, or I'm going to arrest you for disorderly conduct." R. 84-3, 1391. When Officer Dunn was asked at deposition if Ms. Little "wanted Keon to do the same thing you wanted him to do" and "was verbalizing that in a way that

you could hear it," he replied in the affirmative. R. 77-1, PageID 500. When asked if he would have objected had the Littles gone inside the house when he ordered them to go back to the porch, Officer Dunn replied, "No." R. 77-1, PageID 512. Officer Dunn also acknowledged that he never objected to Ms. Little's repeated instructions to Keon to go into the house. These facts suggest that, for a period of time, Officer Dunn did not believe Keon would be violating his orders by entering the house. Second, the record contains conflicting accounts of *how* Keon made his way back to the house: Officer Dunn testified that when he told Keon he was under arrest, Keon ran inside the house; Ms. Little denied that he ran and said instead that he walked to the house. Third, Ms. Little testified that Keon was standing just on the other side of the storm door when Officer Dunn performed the arm bar takedown. Officer Dunn denied being able to see Keon but acknowledged that the storm door was glass, which suggests he may have been able to see inside and observe that Keon was unarmed. Fourth, just after the takedown, when Officer Hammonds was present, both officers were attempting to keep Keon *inside* the house while they arrested Ms. Little because, as Officer Dunn described it, Keon had become "irate and aggressive" after observing the takedown. The officers' efforts to keep Keon inside is consistent with Ms. Little's claim that he was standing at the glass storm door while the takedown was taking place.

Taken together and viewed in the light most favorable to Ms. Little, these facts suggest that the dispatch call did not mention Keon brandishing a gun or there being a gun inside the house; that Keon had calmed down by the time Officer Dunn arrived; that Keon ultimately obeyed Officer Dunn's orders, albeit while clearly voicing his displeasure; that he walked back to the house after being placed under arrest; that he was visible on the other side of the storm door when the takedown took place; and that, by the time Ms. Little was being arrested, Officer Dunn thought it wiser to keep Keon inside. Thus, at summary judgment, the record paints a picture of Keon's conduct that,

while disquieting, is not entirely consistent with Officer Dunn's theory that it was necessary to enter the house without a warrant to prevent him from getting a weapon.

We need not resolve the constitutional question, however, because even if Officer Dunn did violate Ms. Little's Fourth Amendment rights when he attempted the arm bar takedown, that violation was not clearly established. *See Goodwin*, 781 F.3d at 321. The Supreme Court has emphasized that courts should take care "not to define clearly established law at a high level of generality," which is "especially important in the Fourth Amendment context." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation modified). In the specific context of excessive force claims, the Court has instructed that "the clearly established law must be particularized to the facts of the case," such that the general rules outlined in the seminal cases "*Garner* and *Graham* do not by themselves create clearly established law outside an obvious case." *White v. Pauly*, 580 U.S. 73, 79–80 (2017) (per curiam) (citation modified).

Here, Ms. Little has not identified clearly established law that is sufficiently "particularized to the facts of the case." *Id.* (citation modified). In a somewhat similar case, *Williams v. Maurer*, we held that a group of police officers was not entitled to qualified immunity when a woman was physically blocking them from entering her apartment by bracing her knee against the door, while protesting that they did not have a warrant, and the officers forced the door open anyway, injuring her knee. 9 F.4th 416, 424, 436–38 (6th Cir. 2021). The officers in *Williams* were dispatched to an apartment building to respond to a domestic violence tip from an anonymous caller who heard a woman screaming. *Id.* at 423. But before entering the plaintiffs' home, the officers were told "that the anonymous caller had retracted her identification of [the plaintiffs' apartment] as the site of the alleged disturbance" and "was no longer positive what apartment it was coming from." *Id.* at 433 (citation modified). We found there was a factual dispute regarding whether a "real

exigency" justified the officers' warrantless entry. *Id.* at 439 (quotation omitted). Denying qualified immunity, we explained that "[i]f Defendants forcibly entered [the plaintiffs'] home armed with neither a warrant nor an exception to the warrant requirement, the use of any amount of force to effectuate this unconstitutional action constituted unreasonable 'gratuitous violence.'" *Id.* at 440 (citing *Walters v. Stafford*, 317 F. App'x 479, 491 (6th Cir. 2009)).

Yet "the 'totality of the circumstances' inquiry into a use of force has no time limit," *Barnes*, 605 U.S. at 80, and the circumstances that led to Officer Dunn's use of force make plain that *Williams* is distinguishable. Whereas the officers in *Williams* had received information indicating that the screaming the anonymous caller heard might have come from a different apartment, *see* 9 F.4th at 433, Officer Dunn was responding to a dispatch call that not only clearly involved the Littles but alleged specifically that they had engaged in violent acts (Ms. Little hitting Kyle's car with the baseball bat) or threats (Keon threatening to shoot him). In *Williams*, furthermore, the interaction between the plaintiffs and officers did not begin to escalate *until* the officers knocked on woman's door, questioned her briefly, and then began to force their way in, "even though none of the Defendants noticed any visible injuries . . . or saw any signs of suspicious activity." *Id.* at 424. Here, in contrast, tensions between Officer Dunn and the Littles had escalated substantially—to the point of him placing Keon under arrest—before Ms. Little attempted to block Officer Dunn from entering the house. Thus, the factual differences between these cases prevent *Williams* from clearly establishing a violation here.

For all these reasons, we hold that Officer Dunn is entitled to qualified immunity on Ms. Little's excessive force claim because he did not violate her clearly established Fourth Amendment rights by attempting the arm bar takedown.[4]

### B.       State Law Claims Against Officer Dunn

Ms. Little also asserted state law claims for assault, battery, and malicious prosecution against Officer Dunn. He argues that these claims are barred by official qualified immunity under Kentucky law. "Under Kentucky law, qualified immunity protects a police officer so long as he performed '(1) discretionary acts or functions . . . ; (2) in good faith; and (3) within the scope of [his] authority.'" *Reich v. City of Elizabethtown*, 945 F.3d 968, 982 (6th Cir. 2019) (quoting *Yanero v. Davis*, 65 S.W.3d 510, 521–22 (Ky. 2001)). Ms. Little challenges only the second factor, contending that Officer Dunn did not undertake her arrest in good faith. This component of qualified official immunity has "both an objective and subjective aspect." *Yanero*, 65 S.W.3d at 523. The objective aspect asks whether there was a "violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position." *Id*. This test mirrors the objective reasonableness standard of the qualified immunity analysis above, *see id.*, which here yielded the conclusion that Officer Dunn did not violate Ms. Little's clearly established rights. We next turn to the subjective aspect of the inquiry, which asks whether "the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Id.* Ms. Little presents no argument as to any intention of Officer Dunn to harm her. Nor does the record

---

[4] In reaching this holding, we do not comment on the fact that, as Ms. Little concedes, Officer Dunn lost his balance and fell on her *during* the takedown part of the maneuver. *See* Appellant's Br. 9. While such a mistake could conceivably impact our analysis in a different case, it does not here, because Ms. Little contends he should not have put her in an arm bar in the first place.

contain evidence of such intention. Therefore, qualified immunity applies to Ms. Little's assault and battery claims.

As to Ms. Little's malicious prosecution claim, under Kentucky law qualified immunity is unavailable in such an action. *Martin v. O'Daniel*, 507 S.W.3d 1, 5 (Ky. 2016). This is because "[a]cting with malice," a requisite element of malicious prosecution, and "acting in good faith," a requirement for qualified immunity, "are mutually exclusive." *Id.* Therefore, "if the plaintiff cannot prove malice, the officer needs no immunity," because, by definition, he has not engaged in malicious prosecution. *Id.* Accordingly, because Ms. Little failed to demonstrate bad faith (i.e., malice), Officer Dunn cannot be held liable for malicious prosecution. The district court properly granted summary judgment to Officer Dunn as to Ms. Little's state law claims.

## C.      Claims Against Chief Ealum and the City of Owensboro

In one paragraph, Ms. Little also challenges the district court's grant of summary judgment to Ealum (OPD's chief of police) and the City of Owensboro. But she offers no reasons why they can be held independently liable for any violation of either state or federal law by their employees. Her perfunctory briefing has thus forfeited any such theory of liability. *See Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022).

## IV.    CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

**HELENE N. WHITE, Circuit Judge, dissenting.** I do not agree that Officer Dunn is entitled to qualified immunity on Dana Little's Fourth Amendment excessive-force claim. And because the district court's conclusion to the contrary underpinned its dismissal of Ms. Little's other claims, I would remand for reconsideration of those claims in the first instance.

## I.

"[A] government official is entitled to qualified immunity unless the evidence, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023) (citation modified). The plaintiff has the burden of showing that the defendant is not entitled to qualified immunity. *Mosier v. Evans*, 90 F.4th 541, 546 (6th Cir. 2024). When there is video of an incident, we may not adopt a version of the facts "that is 'blatantly contradicted' by video footage," *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)), but we "must nonetheless 'view any relevant gaps or uncertainties left by the videos in the light most favorable to the [p]laintiff.'" *Raimey*, 77 F.4th at 447 (quoting *LaPlante*, 30 F.4th at 578).

I agree with the district court and the majority that *Graham v. Connor*, 490 U.S. 386 (1989) provides the appropriate framework for analyzing the merits of Ms. Little's excessive-force claim. Under *Graham*, we weigh three factors: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the officer or others, and (3) whether the suspect actively resisted arrest. *See Graham*, 490 U.S. at 396. The majority concludes that Ms. Little's rights were not clearly established. I disagree.

**II.**

Viewing the evidence in the light most favorable to Ms. Little, Officer Dunn employed excessive force in attempting to enter her home. I agree with the majority that the first *Graham* factor—the severity of the crime—weighs in Ms. Little's favor, given that neither hindering prosecution nor disorderly conduct are severe offenses.

On the third factor, the majority concludes that Ms. Little actively resisted arrest, finding that she exhibited verbal hostility and refused to be handcuffed. The audio confirms that Officer Dunn ordered Ms. Little to "give [him her] hands," then to "turn around" and, at the end of the interaction, to "stop resisting." R. 104, Doorbell Video Recording 20:30-55. The audio also confirms that Ms. Little repeatedly verbally objected to those commands. *Id.* But Ms. Little testified that Officer Dunn "already had ahold of [her] wrist" when he told her she was under arrest and asked for her hands. R. 84-3, PageID 1395.

As for the second *Graham* factor, as the majority lays out, factual disputes prevent us from determining, as a matter of law, whether Ms. Little posed a danger to Officer Dunn or others. Officer Dunn contends that he had a reasonable fear that Keon was going into the house to retrieve a gun. Dunn bases this fear on the information he received from the 911 call indicating that Keon had threatened to shoot Kyle. Dunn thus argues that Ms. Little posed a threat by preventing his entry into her home in pursuit of Keon.

Ms. Little disputes this account. She first notes that nothing Officer Dunn encountered at the scene supported his asserted belief that Keon was going into the house to retrieve a gun. Ms. Little also testified that Officer Dunn instructed Keon to return to the porch. R. 84-4, PageID 1481 ("He said, 'take your ass back on the porch.'"). Ms. Little points out that Keon was returning to the house when he called Officer Dunn a "bitch" or "bitch-made," and that it was only after that

insult that Officer Dunn decided to arrest Keon. Appellant's Br. at 12 (citing R. 77-1, PageID 506). And after Keon went into the house, Officer Dunn never ordered him to exit. Ms. Little thus argues that Keon was obeying Office Dunn's original command, albeit going further and entering the house, suggesting that there was no safety concern. Finally, Ms. Little also testified that Keon returned to the glass front door and was visible before Officer Dunn attempted to enter the home. R. 88-3, PageID 1399 ("Keon was standing in the door when me and Officer Dunn was standing on the porch."). In his own deposition, Officer Dunn acknowledged that the door was glass, but denied being able to see Keon.

Taking the facts in the light most favorable to Ms. Little, a jury could conclude that neither she nor Keon posed an imminent threat to Officer Dunn. As an initial matter, we have typically required more than a 911 call to justify warrantless entry into a home. *See Hoover v. Due*, 152 F.4th 749, 756 (6th Cir. 2025) ("A 911 call, vaguely reporting an altercation, is not enough to justify an officer's warrantless entry into a home."); *Reed v. Campbell Cnty.*, 80 F.4th 734, 744 (6th Cir. 2023). Further, Officer Dunn has presented no evidence from the scene—such as the presence of a firearm or additional threats or threatening behavior—supporting his belief that Keon was retrieving a gun. Nor did the 911 call itself state that there was a gun, merely that there was a threat. Keon's shouts and insults do not move the needle because he did not make additional threats or suggest the presence of a weapon. Finally, a reasonable jury could conclude that Keon was visible in the door frame and that Dunn therefore had no basis for believing that he posed an imminent threat. Crediting Ms. Little's version of events, as we must at this stage, the third *Graham* factor supports the conclusion that Officer Dunn's use of force to obtain entry into the house was excessive.

Beyond impacting the *Graham* analysis, crediting Ms. Little's version of events undermines the constitutionality of Officer Dunn's attempted warrantless entry into her home. In *Williams v. Maurer*, albeit a case not cited by Ms. Little, we held that officers were not entitled to qualified immunity for forcing a door open and injuring the plaintiff who had been attempting to hold it closed. 9 F.4th 416, 439 (6th Cir. 2016). We determined that the plaintiff had raised a factual dispute regarding whether there was a "real exigency" that would permit the officers' warrantless entry, and that a "reasonable jury could conclude that the force used by Defendants to forcibly open Mitchell's door while she lawfully attempted to assert her Fourth Amendment right to be free from an unreasonable search and seizure was gratuitous, and accordingly, violated her Fourth Amendment right to be free from excessive force." *Id.* at 439 (citation modified). We explained that "[i]f Defendants forcibly entered Mitchell's home armed with neither a warrant nor an exception to the warrant requirement, the use of any amount of force to effectuate this unconstitutional action constituted unreasonable gratuitous violence." *Id.* at 440 (citation modified).

Here, Officer Dunn attempted warrantless entry into Ms. Little's home over her objection, leading to her arrest. For a warrantless entry to be constitutional, one of the following exceptions must be present: "(1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, or (4) a risk of danger to the police or others." *Goodwin v. City of Painesville*, 781 F.3d 314, 330 (6th Cir. 2015). Officer Dunn relies on the fourth exception— the risk of danger. The district court concluded that, "[g]iven Dunn's impression that Keon might have been retrieving a gun from the house, it is not objectively unreasonable for an officer in Dunn's position to believe he could lawfully enter the house under these exigent circumstances." R. 106, PageID 2141. But if Officer Dunn's conclusion that Keon presented a danger was not

reasonable, any attempted warrantless entry was unconstitutional. As described, the facts cut in both directions: Officer Dunn received a 911 call stating that someone threatened to shoot Kyle, but nothing at the scene indicated the presence of a gun or other weapon. "Our precedent gives this exigent-circumstances question to the jury whenever reasonable minds could differ on the answer." *Hoover*, 152 F.4th at 763 (Murphy, J., concurring) (acknowledging but questioning this rule). Properly crediting Ms. Little's version of the facts, as we must at this stage, no exigency existed and she was justified in standing on her Fourth Amendment rights. Any force used in service of the attempted warrantless entry was therefore gratuitous.

**III.**

The second part of the qualified immunity inquiry asks whether "the right was clearly established." *Raimey*, 77 F.4th at 447 (citation modified). In determining whether conduct violated clearly established law, courts must not define the law "at a high level of generality." *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011). Instead, "the clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The majority concludes that Ms. Little has not identified clearly established law that is sufficiently particularized to the facts of this case. But in similar cases, we have held that officers violate clearly established law when they make a warrantless entry without an exception to the warrant requirement and that any force used in service of the warrantless entry is gratuitous. *Hoover*, 152 F.4th at 761 ("Existing precedent placed the constitutional question here—whether an officer can make a warrantless entry into a home without an exception to the warrant requirement—beyond debate.") (citation modified); *Williams*, 9 F.4th at 440 ("it is clearly established that warrantless entry into a home without an exception to the warrant requirement

violate[s] clearly established law. Likewise, it is clearly established that gratuitous violence is never reasonable because there is simply no governmental interest' justifying gratuitous violence.") (citation modified); *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 999 (6th Cir. 1994) ("The right O'Brien alleges to have been violated was clearly established: the right of persons to be protected from a warrantless search of their house unless exigent circumstances require immediate police action."). In those cases, we did not require a particularized case demonstrating the absence of exigent circumstances.[1]

But even if we sought to define Ms. Little's rights with greater specificity, Officer Dunn's conduct would still violate clearly established law. In *Williams*, we held that it was clearly established in 2018 that officers could not use force to effectuate a warrantless entry based on an anonymous domestic violence tip that had since been retracted. 9 F.4th at 433, 439. *Williams* focused on the fact that nothing from the scene corroborated the anonymous caller's story. *Id*. at 434. So too here, Officer Dunn's claim of exigency is based largely on his purported fear of a gun, but nothing from the scene supported that fear. To the contrary, Officer Dunn appears to have ordered Keon back to the house, despite now claiming he feared Keon was going for a gun. *Williams* shows that clearly established law prohibits officers from using any amount of force to effectuate a warrantless entry based on danger reported in a 911 call but not corroborated on the scene.

The majority distinguishes *Williams*, noting that the 911 call here clearly involved the Littles, but the officers in *Williams* should have realized they were at the wrong apartment. But

---

[1]In *Hoover*, the majority noted that "on other occasions, this court has defined the constitutional right more particularly." 152 F.4th at 761. Specifically, this court has occasionally asked whether the absence of exigent circumstances itself was clearly established. *Id.* (citing *Gradisher v. City of Akron*, 794 F.3d 574, 584 (6th Cir. 2015)). We need not decide the matter, however, because our precedents clearly establish the absence of exigent circumstances in the situation facing Officer Dunn.

that is not a meaningful distinction because, just as the uncorroborated 911 call in *Williams* did not give officers exigent circumstances, neither did the call dispatching Officer Dunn in this case. The majority also notes that the tensions between Officer Dunn and the Littles escalated substantially. But the escalation did not involve any further references to a gun—Officer Dunn's purported basis for concluding that exigent circumstances existed.

Other cases bolster this conclusion. In *Hoover v. Due*, we held that "[a] 911 call, vaguely reporting an altercation, is not enough to justify an officer's warrantless entry into a home." 152 F.4th at 756. There, when an officer responded to a domestic violence call reporting that a man had threatened a woman with a gun, a witness pointed out the plaintiff and said he had "gone crazy." *Id.* at 752-53. Even with the specter of a gun and a witness confirming that the officer was responding to the correct address, we still found the officer's warrantless entry unlawful. So too here, even though Officer Dunn responded to the correct address, he was not permitted to enter Ms. Little's home simply because the 911 call referenced a threat to shoot the caller. *See also Goodwin v. City of Painesville*, 781 F.3d at 332 (no exigent circumstances where witnesses made statements about violent and threatening behavior that were not corroborated on the scene).

In sum, I would reverse the entry of summary judgment on Ms. Little's excessive-force claims.

## IV.

The district court's conclusion that Officer Dunn did not use excessive force underpinned its dismissal of Ms. Little's state-law assault-and-battery and malicious-prosecution claims against Officer Dunn, state-law vicarious liability claims against OPD's chief of police and the City of Owensboro, and *Monell* claim against the City of Owensboro. Although some of those claims likely face other obstacles, I would remand for reconsideration of those claims in the first instance.